## The COMMONWEALTH v. The EASTON BANK.
## The EASTON BANK v. The COMMONWEALTH.

A bank chartered under the act of 1824, which prescribes the payment of a certain tax on dividends declared, is subject to a subsequent general law, which increases the rate of taxation although its charter had not then expired.

Such an act is constitutional.

A general law, taxing the dividends of banks, was passed on the 1st of April. On the 7th, an act was passed, extending the charter of an existing bank from a future period, when the former charter would expire. The act of the 7th contained a provision for taxation similar to that of the 1st, but taxes were not to be levied under it until the new charter went into operation. The latter act does not repeal the former.

The auditor-general and state treasurer have jurisdiction under the act of 1811, &c., to settle an account and state a balance against a bank for unpaid taxes on dividends. And the fact that an amount was paid and received by the treasurer for such taxes, does not preclude a subsequent settlement of an account for the excess legally due.

The bank is liable only for 6 per cent. interest, after three months from such settlement, where the case is tried on appeal therefrom to the Common Pleas of Dauphin, under the act of Assembly. For this is a special jurisdiction, and the act creating it fixes the rate of interest, and the time for which it shall be paid.

IN error from the Common Pleas of Dauphin.

The questions arising on these writs of error were, the liability of the Easton Bank to pay taxes on certain dividends, under the act of April 1, 1835; and, if so, at what rate and from what time interest was chargeable.

The charter of the bank was granted in 1814, to expire in 1825. By the act of that year, this bank, with several others, was incorporated, " upon the conditions hereinafter specified." By the 24th section, the bank was required, on the first Monday in November of every year, to pay to the state treasurer 8 per cent. on the dividends declared during the preceding year: if these payments were not made within two months from that day, the bank was liable to 12 per cent. interest from that day, which, with the principal, was declared recoverable in any court having competent jurisdiction. If no dividends were declared during any year preceding that day, the charter was to be void: This charter expired on the first Wednesday in May, 1837.

On the 1st of April, 1835, an act was passed, directing all banks to pay, in the manner now required by law, a tax of 8 per cent. on dividends not exceeding 6 per cent. per annum; if more than 6, and not exceeding 7 per cent., a tax of 9 per cent.; if more than 7, and not exceeding 8 per cent., a tax of 10 per cent.; if more than 8 per cent., a tax of 11 per cent. On the 7th of this month, the charter of the Easton Bank was extended for fifteen years, from the day its former charter would expire (May, 1837). By the 2d section, the bank was required, after the first Wednesday of May, 1837, and thenceforward, to pay a tax similar to the one imposed by the act of April 1. The dividends declared

by the bank were :—In 1835, March 27, 12½ per cent.; May 5th, 5 per cent.; Nov. 3, 4⅘ per cent. In 1836, May 3, 4⅘ per cent.; July 8, 11⅓ per cent.; Nov. 1, 4 per cent. In 1837, May 2, 4 per cent.; Nov. 7, 3½ per cent. During these years, the cashier remitted the statement required by law, and 8 per cent. on the amount of the dividends declared. This was received by the state treasurer, and an entry made of the receipt in the books of the treasury office. Afterwards the bank paid the tax, under the act of April 7th, 1835. In 1847, a demand was made for the taxes claimed to be due, under the act of April 1, 1835, on the dividends declared after that time, and before the payments under the new charter. The claim was for 10 per cent. on the dividends of May and November, 1835; 11 per cent. on the dividends of 1836; 10 per cent. on those of 1837. Deducting the amount paid, the balance was $3,232. The bank refused to pay, and the account was settled under the act of 1811, the bank being charged with 12 per cent. interest on the balance due in November of each year. An appeal was taken, and the cause tried before the Common Pleas of Dauphin (ELDRED, P. J.), and a verdict rendered for the commonwealth. The points there raised, and which were assigned for error here, were: 1. The auditor-general and state treasurer had no jurisdiction to make the settlement. 2. That the tax for 1835–6–7, was only 8 per cent. 3. The account had been settled by the entry and receipt of the treasurer, and could not be opened. 4. The question of interest.

This last point was also excepted to by the commonwealth; the judge below ruling that interest was chargeable, under the act of 1811, at 6 per cent., from three months after the account was settled.

*Alricks* and *Reeder*, for the bank.—The act of 1811 is in derogation of the common law, and to be construed strictly; it confines the jurisdiction of the auditor to public accounts. Here there was none. It was either a tax due or paid. The act of April 1, 1835, if it included the bank, was repealed by that of April 7, which contains a similar tax clause, but postpones its operation. Unless this was so, the latter act was unnecessary. Such was the construction of the accounting officers until 1847. But if it did include this bank it was unconstitutional, for the charter had not then expired; and it was granted on conditions, one of which was the payment of a certain tax. The 9th section of the act of 1824, gives no right to charge an additional price for the franchise. This contract was

then violated, and the act is void: 4 Wheat. 627; 1 Greenl. 79;
6 Barr, 379; 9 Cranch, 52; 8 Wheat. 1; 2 Kent, 306.; 2 Mass.
146; 9 Wend. 351; 17 John. 195; 2 Stew. 30; 3 Pick. 342; 10
Conn. 522; 6 Greenl. 112; 2 Penna. 184; 1 Atk. 264; 1 R. 189.
In 4 Pet. 514, the bank had a perpetual charter, and nothing was
paid for it. It was agreed that, had there been a stipulation not
to tax, it would have been void: Ib.; 7 Cr. 164. Here there was
an implied waiver by the stipulation for a fixed price: 12 Mass.
252. The account had virtually been settled by the payment of a
sum, which was accepted, in full satisfaction, and could not, there-
fore, be opened.

*H. Alricks* and *McCormick*, for the commonwealth.—The act of
1811 extends to all claims by the state on any person or corpora-
tion, and hence includes this case. The act of April 1 was a
general·law; that of April 7 was a special law. The fact that a
provision contained in the former is embodied in the latter, affords
no ground to argue that it is thereby repealed, especially when the
operation of the latter is deferred. The act was constitutional, for
though the franchise cannot.be taxed, the corporate property may
be: 3 How. 133. This right has been uniformly sustained: 1 Hill,
616; 2 Ib. 353; 25 Wend. 686; 10 Ohio, 91; 2 Gill, 487. The
right must have been explicitly relinquished to be lost: 12 Mass.
252; 4 Pet. 514.

The commonwealth is entitled to twelve per cent. interest, under
the act of 1824, for the court below was a court of competent juris-
diction; unless this were so, the appeal was a nullity, and the
account as settled remains in force. The act of 1835 refers to the
existing law. So far as the rate of interest was regulated in such
cases, that was the act of 1824. Clearly, however, six per cent.
from the default should have been allowed: 6 Bin. 159; 3 W. &
S. 271.

*July* 5, 1849. BELL, J.—These writs of error bring up the
same record, and may conveniently be considered together.

The first point presented is, whether the accounting officers of
the commonwealth are invested with power to state an account
between the state and the Easton Bank, under the provisious of the
act of 30th of March, 1811. The language of the 1st section of this
act, conferring jurisdiction, is very broad and comprehensive. "All
accounts. between the commonwealth, and any person or persons,
body politic or corporate, as well as those with officers of the reve-

2 P

nue, as other persons intrusted with the receipt, or who have, or hereafter may become possessed of public money, &c., shall be examined and adjusted by the auditor-general, according to law and equity." The 3d section speaks of any *public* account examined and adjusted, and the 11th provides for an appeal by any person dissatisfied with the settlement of their accounts. It is obvious, the object of the law-makers was to bring within the adjusting authority of the public agents, the settlement *primâ facie* of all pecuniary claims made by the government against persons, natural or artificial, springing from any source whatever; as well as all demand made by such persons against the state. The evil felt, was the difficulty of ascertaining the rights and liabilities of the public, except through the tedious, and frequently, utterly inadequate process of a suit at law; the remedy proposed, was the erection of a tribunal competent to decide many difficulties, which are apt to spring from matters of account, without investing it with the power of final judgment. To effect this, authority broad enough to cover every case that might arise was necessary, and, accordingly, language sufficient for this purpose was employed. As the statute is remedial, and in practice found to be very beneficial, the courts have been liberal in its construction. Its operation has not been confined, as the bank seems to think it ought, to technical accounts; but has been extended to embrace every case where one retains public money which ought to be paid into the public coffers, no matter under what appellation received. Whether called tax, or dividends, or portions of fees of office, the sums received for, and retained from the public use, fall within the purview of the act: Commonwealth *v.* Reitzel, 9 W. & S. 109; Hutchinson *v.* Commonwealth, 6 Barr, 124. Indeed, without this power residing somewhere, it would be extremely difficult, if not impossible, to conduct the financial affairs of government, especially during such periods of depression and distress as, for some years past, have almost paralysed the energies of Pennsylvania. It ought not, therefore, to be lightly yielded to nice verbal criticisms, or upon the suggestion of a possible abuse of authority; such apprehensions are, in practice, found to be fallacious, for the act itself offers ample means of redress. It is only the obstinate or the careless who may be exposed to injury; and even these, in the actual working of the system, are found to be put to little hazard.

We have, for these reasons, and others that might be added, felt not the slightest hesitancy in pronouncing, that the ascertainment

of balances due from banks, for taxes imposed on dividends declared, is within the province of the auditor-general and state treasurer.

The sums here in controversy, are officially asserted by these officers to be due from the Easton Bank to the state, under the provisions of the act of April 1st, 1835. The bank resists the claim on two grounds. The first of these is, that the act is inapplicable to her, and the second, that if even by its terms found to be applicable, it is, under the circumstances brought to view, unconstitutional. Each of these positions is based upon other enactments. The act of April 1st directed that, thereafter, the several banks of the commonwealth, then subject by law to the payment of a tax on their dividends, should pay into the treasury, in the manner directed by law, a graduated tax, increasing by a regular progression from 8 to 11 per cent: the amount being determined by the rate per cent. of profits declared in any year. Before the passage of this statute, the Easton Bank, in common with the other banks of the state, was subjected by law to the payment of 8 per cent. of the whole amount of the dividend declared during the preceding year; to be transmitted to the state treasurer by the officers of the bank. The Easton Bank, therefore, falls precisely under the terms of the act of 1835. But, though thus within its language, it is asserted she is withdrawn from its influence, by force of the act of April 7th, 1835. This is entitled " An act to recharter the Easton Bank;" and does, accordingly, extend her charter for fifteen years, from the first Wednesday in May, 1837. The second section provides, that " the bank, whose charter is hereby extended, shall, *after the first Wednesday in May*, in the year 1837, and thenceforth during the full time for which its charter is extended, pay into the treasury of the commonwealth in the manner now directed by law," the same tax as was imposed by the prior act of the 1st of April. The argument is, that these two acts are incompatible, so far as they relate to the payment of tax, and, therefore, the latter operates as a repeal of the former, by necessary implication. This argument is based upon the fact that, while the first of these statutes directs the payment of the graduated tax, by all the banks, immediately after the date of its enactment, the younger of them appoints the payment, so far as the Easton Bank is concerned, to commence after the first Wednesday in September, 1837, leaving an interval of more than two years between the respective periods; which, it is thought, involves an irreconcileable inconsistency. If this be so, doubtless it works a repeal of the elder statute, for the

maxim is, *leges posteriores priores contrarias abrogant.* But, it is said, this rule is to be received with great caution, for it is in general necessary that the intention to repeal be expressed in clear and unambiguous language, and not left to be inferred from a subsequent statute. And the maxim is subject to the restriction, that an ancient statute will be impliedly repealed by a more modern one, only when the latter is couched in negative terms, or when the matter is so clearly repugnant that it necessarily implies a negative; for implied repeals are not favoured by law: 2 Dwarr. on Stat. 638, 673; Williams *v.* Pritchard, 4 T. R. 2, 4; Rix *v.* Borton, 12 A. & E. 470. Where both acts are merely affirmative, and the substance such that both may stand together, both shall have a concurrent efficacy: 1 Bl. Com. 89; Dr. Foster's case, 11 Rep. 57. In our case, it is to be observed, the posterior statute contains no negative words. It ordains that the tax shall be paid after May, 1837, but it does not say it shall not be paid before that period. It is, therefore, not clearly repugnant with the first act, which provides for an earlier payment, and no more. They are both merely affirmative laws, and may both stand together, having an operation during different periods. It is true, the latter may have been unnecessary, but it is easy to see how it came to be enacted, without imputing to the legislature an intent to repeal the prior law, which is never to be done but from necessity. A glance at the history of this legislation, will furnish a key to the seeming difficulty. In the session of 1835, the increasing financial difficulties of the state suggested the necessity of increased taxation. This gave birth to the act of the 1st of April, applicable to all the banks of the commonwealth, with one exception. Shortly afterwards, the application of several of these banks, including the Easton Bank, for an extension of their respective charters, came under consideration. These charters would expire, by their own limitation, in the year 1837. The act of April 7th, for their renewal, was therefore prospective, and, as its principal object was effected by extending the provisions of the prior bank act of March, 1824, which, of course, contained no stipulation for the payment of the new tax, the exactions of the enactment of the first of April were repealed, *ex majore cautela.* The intent was, to leave no room for doubt after the new charter should go into operation; not to exempt the Easton Bank from a burden imposed upon all similar corporations. Had the taxing portion of the law been omitted, the argument would have been, the legislature did not intend its continuance after 1837, because they had not so said in the act re-creating the

bank. That such was the object of the re-enactment, is, if possible, made still more clear by reference to the acts rechartering the Banks of Chester County, of Germantown, and the Farmers' Bank of Lancaster, passed on the same 7th of April; and of the Harrisburg Bank, enacted shortly after. Each of these contains the same provision, and thus makes it manifest it was not intended for exemp-- tion, but to operate as a part of a general system, when these acts should take effect. But, perhaps, more has been said on this head than the difficulties of the point called for.

The attack directed against the constitutionality of the act mainly in question, derives whatever vigour it possesses from the act of March, 1824, already mentioned. By that act, the Easton Bank, with twenty-one other similar institutions, was erected into a corporation, "upon the conditions thereinafter specified." The 26th article of the 3d section imposed a tax of 8 per cent. upon each yearly dividend, declared by the several banks thus incorporated, without saying anything as to future burdens to be imposed by the legislature, or expressly reserving the right to lay further taxes. Upon the ground that this act was creative of a contract between the commonwealth and the several corporations created by it, it is assumed the act of April 1st is void, as being in contravention of Art. I. of the Constitution of the United States, forbidding a state to pass any law impairing the obligation of contracts. Under the authority of the numerous cases cited on the argument, it is not to be questioned that the original and subsequent charters granted to the Easton Bank, are contracts within the meaning of the constitution, and entitled to its protection. Any law, therefore, impairing their obligation, or materially interfering with their fundamental conditions, is destitute of binding efficacy. But, though this be settled beyond controversy, it is equally well ascertained that a law levying a tax upon the capital stock, dividends, or other property of these institutions, or their shareholders, is not obnoxious to constitutional animadversion. This question has frequently engaged the attention of some of the highest judicial tribunals of the country; and all concur in conceding this power to the legislature, unless, indeed, it be relinquished, either expressly or by necessary implication, in the charter itself, or by some subsequent legislation. This doctrine is announced, among other cases, by the courts of New York, in 1 Hill, 616, 2 Ib. 353, and 25 Wend. 686; of Ohio, in State v. Franklin Bank, 10 Ohio R. 91; of Maryland, in State v. Mayhew, 2 Gill, 487; and of Massachusetts, in Portland Bank v. Apthorp,

12 Mass. R. 252. It has also received the sanction of the Supreme Court of the United States, in Gordon *v.* The Appeal Tax Court, 3 Howard, 133, and in the Providence Bank *v.* Billings, 4 Pet. 514. In this last case, the remarks of the late Chief Justice Marshall are of peculiar value, as showing the vital importance of the taxing power, as necessary to the very existence of government, and the extreme caution with which any assertion of its relinquishment should be received. "It would seem," he observed, "the relinquishing of such a power is never to be assumed. The court will not say that a state may not relinquish it; that a consideration sufficiently valuable to induce a partial release of it may not exist; but, as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the state to abandon it does not appear." These views, the soundness of which are beyond question, were expressed in a case where a banking institution sought to escape the general burden, by setting up her supposed immunities as a chartered corporation. I have, therefore, given them a place, as directly applicable to the case in hand; for, while our bank acknowledges the general power residing in the legislature to exact from these institutions contributions in aid of the public necessities, she seeks to shelter herself under a supposed special exemption, to be found within the limits of her charter. If such an exemption exists, it must be the result of a deliberate intention to relinquish this prerogative of sovereignty, distinctly manifested. Let us see whether such a purpose is discoverable. As evidencing an agreement, upon the part of the state, not to lay any further excise or duty upon the business of the bank, during the continuance of its charter, we are pointed to, the 1st section of the act of 1824, which is said to have prescribed the conditions on which the charters were granted. But it is obvious to even careless observation, that the conditions pointed to, and which follow in the succeeding sections, were intended as restraints upon the banks, to limit their power and to prescribe the mode in which their business should be conducted; and not as pacts by which the government undertook to relinquish any power inherent in it, or to confer immunities beyond those expressly given. The 24th article, upon which stress is laid, is nothing more than a simple declaration of the tax then to be paid by these institutions, and we there look in vain for the slightest intimation of an agreement or even understanding between the parties, that this tax should not be increased during the existence of the charter. To deduce

from premises so insufficient, a consequence of such magnitude, would indeed be a gross violation of the wholesome principle that an abandonment of 'the power of taxation is only to be established by clearly showing this to have been the deliberate purpose of the state. Of the manifestation of such a purpose, we have an instance in the act of 15th April, 1835, rechartering the Mechanics' Bank of Philadelphia, wherein, in consideration of the payment of $100,000, it was provided *that* bank " shall be free from any tax or charge whatever, during the continuance of this charter." That, in legislative estimation, there was nothing tantamount to this in the act of 1824, is very clear, from subsequent enactments increasing, from time to time, the taxes to be paid by the banks of the commonwealth, even down to the 15th of March, 1849; and we think their charters will be searched in vain for any declaration potent enough to attach a doubt upon this conclusion. To this exercise of undoubted power, all of these institutions, vigilant as they are known to be of their rights, and jealous of their privileges, have submitted, except the Easton Bank. Her reluctance to obey, no doubt, originated in the tardiness of the accounting officers of the government in calling her attention to this duty, probably caused by mutual misapprehension. But this neglect will not excuse her ultimate compliance; for the rights of the commonwealth are not liable to be compromised by the nonfeasance of her agents. Nor can her debtor escape through the mistake of her servants acknowledging a sum less than the whole due, as received in full. Even in the case of a private individual, such a case is open to correction; and there is nothing in the 16th section of act of March, 1811, which puts the state in a less favourable position. That section looks solely to accounts settled under the provisions of the act, through the joint agency of the auditor-general and state treasurer, and not to mere entries made in the books of either of these functionaries. There is nothing, therefore, standing in the way of the commonwealth's claim to be paid the increased tax which accrued during the years 1835-6-7.

It remains to consider the question of interest. We think it very clear the state is not, in this instance, entitled to recover twelve per cent. That rate is imposed by the act of 1824, as a penalty for neglect in non-payment of the taxes imposed by that act. The provision is : " And if any of the said annual payments (referring, of course, to the 8 per cent.) be not made within two months after the first Monday in November, &c., then and in that case the said banks, &c., shall be liable to interest upon the amount so due

to the commonwealth, at the rate of 12 per cent. per annum, &c., which said principal sum, with the interest, shall be recoverable in any court having competent jurisdiction." This penalty is thus confined, by the very terms of the statute, to the 8 per cent. tax imposed by it. Neither the acts of the 1st nor of the 7th of April, contain any similar provision to enforce prompt payment of the increased taxes imposed by those laws; and, as a penalty can never be extended by construction merely, it would seem defaulting banks are not liable to be mulcted in 12 per cent. damages under the late acts. The legislature would seem studiously to have avoided the express re-enactment of the penal portion of the older statute, and I do not think it can be extended by force of the words "in the manner now directed by law." The meaning of these words may be fully satisfied by referring to them the time of payment, the officer to whom payment is to be made, and the mode of transmitting the sums due, as well as the manner of ascertaining those sums. It would be a very violent construction indeed, that should extend this sentence to comprehend a penalty provided by another law, when, naturally, the law-makers would have given to such an intent a direct and positive expression.

But were this otherwise, I do not perceive how the penalty could be recovered by this proceeding, under the act of 1811. The act of 1824 speaks of its recovery in a court of competent jurisdiction; and certainly the Common Pleas of Dauphin county is such a court, were it left in the untrammelled exercise of its powers. But it must be recollected that this is a special statutory proceeding, initiated by a statutory settlement, and prolonged by a statutory appeal. By the statute, the accounting officers are to ascertain the balance due, leaving the interest due thereon to be governed by the 36th section, which directs that all balances due to the commonwealth, on accounts settled agreeably to this act, shall bear interest from three months after the date of the settlement, until paid. This provision is peremptory, and binds the courts as well as the accounting agents. Certain it is, the act of 1811 did not contemplate to vest the officers of the state with the discretion of visiting delinquents with a pecuniary penalty, for none such was then provided. I think it just as clear, the act of 1824 did not intend to confer such power by retrospection. There is not a word like it in the statute. On the contrary, with the act of 1811 full in view, it provides an action, irrespective of the prior law, as the means of recovering the penalty for a default, the amount of which was of easy ascertainment, without the interposition of the machinery

provided by the older law. The fact is, this law did not anticipate defaults of long standing. It provided a ready means of compelling prompt settlement; and, therefore, it stipulated the payment of interest only from a period after the date of the settlement. But, be this as it may, it is sufficient for the exigencies of this inquiry, that here is a legal settlement, appended to which is a statement of interest, at 12 per cent. It is apparent from what has been said, that this rate is irrecoverable in this action. But the statute giving the action fixes the rate of interest recoverable, and the time from which it is to run. I do not see how this direction can be transcended without an infraction of the statute. But were this inquiry at common law, it is more than questionable whether, under the circumstances, the commonwealth could demand interest prior to the date of the settlement, or at least of demand made. It is true, as a general rule, that where one unjustly detains money belonging to another, interest for the forbearance is chargeable, as of course: Koons v. Miller, 3 W. & S. 271. But it is equally true, that where the fact of non-payment is ascribable to mutual misapprehension, or to the laches of the creditor, interest is not demandable, as of course: Brown v. Campbell, 1 S. & R. 176; King v. Diehl, 9 S. & R. 409; Laing v. Stone, Moody & Malk. 229, n.; Cameron v. Smith, 2 B. & A. 305. The detention must smack of injustice, to make the debtor liable, unless indeed where he is so in the due course of business and trade.

In the instance before us, it is evident both parties acted, or rather failed to act, through ignorance. It does not appear the defendant was actuated by any improper desire to withhold the moneys of the commonwealth. It may therefore be doubted, whether a larger amount of interest than was recovered below, could fairly be exacted. But it is not necessary, and we therefore do not say what would be the rule, had the commonwealth charged the bank with simple interest on the sums withheld, and ascertained the aggregate balance due. We found ourselves altogether upon the act of 1811, in attaining our conclusion on this part of the case.

Judgment affirmed.