## Oklahoma City v. Shields.

No. 308.   Opinion Filed September 16, 1908.

(100 Pac. 559.)

1.   **MUNICIPAL CORPORATIONS—Paving Streets.**  Act April 17, A. D. 1908 (Acts 1908, p. 166, c. 10), entitled "An act to provide for the improvement of streets and other public places within cities of the first class, by grading, paving, macadamizing, curbing, guttering and draining the same, and declaring an emergency," is valid.

2.   **SAME—Pavement by Street Railway.**  The cost and expenses of making such improvements along such street, where the street railway has two tracks laid, shall be taxed against such railway as provided by said act, two feet on each side of said tracks and the paving in between said tracks.

3.   **SAME—Liability of Abutting Property.**  The costs and expenses of instituting and laying drainage pipes for the purpose of macadamizing, curbing, guttering, and draining, including the cost of all manholes, catch-basins, etc., can be taxed against the property fronting and abutting on said street along which such paving is made and pipes laid.

4.   **SAME—Liability of Railroad.**  An assessment can be made against a steam railroad company to pay for that portion of its right of way including that portion between the rails and two feet on each side thereof, and the assessment therefor shall be the same as against individuals or natural proprietors.

5.   **SAME—Question Not Decided.**  The same rule applies equally to street railways who own any portion of their right of way and abutting lands, unless section 3, art. 4, c. 9, p. 141, Sess. Laws Okla. T. 1903, which provides that "all licenses or franchises heretofore granted to any street railway company authorizing the construction and operation of an electric street railroad in any city of the first class in the territory of Oklahoma, and which have not become forfeited or lapsed by their terms, are hereby ratified, legalized and confirmed," operates to exempt such railway companies as had a license or franchise granted for such purpose by a city of the first class, and had not become forfeited or lapsed by its terms prior to the passage of said act. (a)   Quaere: As to whether or not said section 3, art. 4, operated to exempt such railway companies, except as stipulated in the franchise, the question is reserved and not determined in this case.

Oklahoma City v. Shields.

6. **SAME—Pavement—Designation of Material.** It is the duty of the ·mayor and council to designate under one resolution and under one contract one particular kind of material for such paving or other improvements.

7. **SAME—Street Intersections—Authority to Make General Levy.** The city can make a general levy for the payment of the cost and expenses of the improvements of street intersections against all of the property owners of said city.

8. **STATUTES—Time of Taking Effect—Emergency—Review by Courts.** The declaring of an emergency by the Legislature, when it is expressed in the act that such measure is immediately necessary for the preservation of. the public peace, health, or safety, when such act is not for the purpose of carrying into effect provisions relating to the initiative and referendum, or a general appropriation bill, or does not include the granting of a franchise or license to a corporation or individual to extend longer than one year, nor provision for the purchase or sale of real estate, nor the renting or incumbering of real property for a longer term than one year, is conclusive on the courts.

9. **SAME—Paving Act—Creation of Lien on Realty.** Act April 17. A. D. 1908 (Laws 1908, p. 172, c. 10, sec. 5), relating to paving, providing that "assessments in conformity to said appraisement and apportionment, as corrected and confirmed by the council shall be payable in ten equal annual installments, and shall bear interest at the rate of seven per cent. per annum until paid, payable in each year. * * * Such special assessment and each installment thereof, and the interest thereon, * * * declared to be a lien against the lots and tracts of land so assessed, * * * " creates an incumbrance upon said realty for a longer term than one year, and said act did not take effect until 90 days after the adjournment of the session of the Legislature at which it was passed.

(Syllabus by the Court.)

*Error from District Court, Oklahoma County; J. G. Lowe, Judge.*

Action by John W. Shields against the city of Oklahoma City. Judgment for plaintiff, and defendant brings error. Reversed.

On the 20th day of July, A. D., 1908, the plaintiff in error, as defendant, and the defendant in error, as plaintiff, filed in the district court of Oklahoma county an agreed case, in words and figures as follows:

"That the plaintiff is the owner of certain lots abutting and fronting upon Western avenue, a street extending north and south

in the city of Oklahoma City, state of Oklahoma, and between the north line of Main street in said city, and the north line of Seventeenth street in said city. That said city of Oklahoma City is a city of the first class. That on the 21st day of April, 1908, the mayor and council of the city of Oklahoma City duly passed a resolution to pave certain streets and avenues in said city, among which was included 'Western avenue from the north line of Main street to the north line of Seventeenth street.' That said resolution was duly published as required by law. A copy of said resolution is hereto attached, marked 'Exhibit A,' and made a part of this agreement.

"That pursuant to said resolution the said city council intends to pave and improve said streets, and the expenses of such paving and improvement so to be contracted for are to be charged up against said lots, pieces, and parcels of ground, and to levy assessments thereon to pay for the same as provided in house bill No. 231 of the Legislature of the state of Oklahoma, dated April 17,1908 (Acts 1908, p. 166, c. 10), entitled 'An act to provide for the improvement of streets and other public places within cities of the first class, by grading, paving, macadamizing, curbing, guttering and draining the same, and declaring an emergency.'

"That a railroad intersects and crosses said street about———— blocks north of the north line of Main street, which said railroad is owned and operated by the Chicago, Rock Island & Pacific Railway Company, and the right of way of said railway is one hundred feet. That a street railway line extends along said Western avenue, and has two tracks laid in said street from———— street to ———— street, a distance of ———— blocks, said tracks being four feet apart from rail to rail, and said street railway being owned and operated by the Oklahoma City Railway Company.

"That it is the intention of the city of Oklahoma City to levy an assessment against the property fronting on said Western avenue, for the cost and expenses of said pavement, and charge said costs and expenses by said assessment to each quarter block for the costs and expenses of the paving in front of said quarter block in proportion to the benefit received by each of said lots within said quarter block.

"That it is further the intention of said city to pass a resolution designating asphalt, brick, or macadam as the character of material which may be used in constructing said improvements, and instructing the city engineer to prepare plans and specifications

and estimates of the costs of each of the materials so designated, and further instructed the clerk to publish notice for bids for the doing of said improvements, said bids to be made upon any or each of said characters of materials based upon the respective plans and specifications and estimates of costs to be prepared by said city engineer.

"That it is further the intention of the city council to require of the said street railway, which extends along said street as above stated, to pay for the paving of only six and two-thirds feet for each track, pursuant to a contract heretofore entered into between the city of Oklahoma City and the Metropolitan Railway Company, now Oklahoma City Railway Company, a domestic corporation. A copy of said contract is hereto attached, marked 'Exhibit B,' and made a part of this agreement.

"That the plans and specifications provided by said improvement is to include the institution of certain drainage pipes to be laid along the property of the plaintiff, and which drainage pipes will drain an extensive scope of territory beyond and above the property of the plaintiff, which said territory is not provided with drainage pipes, and it is the intention of the city to tax the costs and expenses of the institution of such drainage pipes to the property immediately fronting said street along which said pipes are laid according to the benefit accrued thereto in quarter block districts.

"That is further the intention of said city to provide for the payment of the costs of improving the street intersections by said city, and to make a special levy therefor against all of the property of said city at the time of the next annual tax levy, after the estimate of costs and expenses is made.

"That upon the above statement of facts the said parties hereto respectfully ask the court to determine the rights of the parties hereto, and render judgment upon the following propositions:

"First. Can assessments be made against the property fronting on the street to be improved according to the benefit thereto in quarter block districts, or can this assessment be legally made against such property under the act of the Legislature of the state of Oklahoma, dated April 17, 1908, entitled 'An act to provide for the improvement of streets and other public places within cities of the first class, by grading, paving, macadamizing, curbing, guttering and draining the same and declaring an emergency?'

"Second. If such act is held valid, and the court holds

such assessment can be made, then shall the costs and expenses of making such improvements along said street where the street railway has two tracks laid be taxed against said railway as provided by said act, two feet on each side of said track and the paving in between said tracks, or shall the railway company be required to pay for only the six and two-thirds feet for each track?

"Third. If it is determined that the street railway company is to pay for only the six and two-thirds feet for each track, then can the remaining  portion between the track and the remaining portion of the two feet provided for in said act be taxed against the property fronting on said street?

"Fourth. Can the costs and expenses of instituting and laying said drainage pipes be taxed against the property fronting and abutting on said street along which said pipes are laid?

"Fifth. Can an assessment be made against the steam railway company to pay for that portion of its right of way more than the portion between the rails and two feet on each side thereof, and, if so, according to what plan shall this assessment be levied?

"Sixth. Has the mayor and council the right, under said act, to designate several materials and provide for the making of bids upon each of the several materials so designated in accordance with plans and specifications and estimates provided therefor, or is the duty of the mayor and council to select one particular material and provide in said resolution for the securing of bids for the construction of said improvements with the one designated material?

"Seventh. Can the city make a general levy for the payment of the costs and expenses of the improvement of said street intersections against all of the property of said city?"

The plaintiff therewith filed his affidavit that the said controversy was real, and the proceedings in good faith to determine the rights of the parties.

The findings and the judgment upon the agreed facts and submissions is in words and figures as follows:

"Changing the order of the seven submissions to the court for findings, we will consider the second first: 'If such act is held valid, and the court holds such assessment can be made, then shall the costs and expenses of making such improvements along said street where the street railway has two tracks laid be taxed against said railway as provided by said act, two feet on each side of said

tracks and the paving between said tracks, or shall the railway company be required to pave only the six and two-thirds feet for each track?' If the act is valid, the street railway can only be compelled to pay for paving six and two-thirds feet for each track. The franchise or contract between the city of Oklahoma City and the street railway company forms the basis upon which assessments alone can be made against the street railway company. The contract between the city and the railway company was entered into February 8, 1902, and the act in question, being passed April 17, 1908, the latter can not change or alter the pre-existing right of the railway company.

"Considering next the third submission: 'If it is determined that the street railway company is to pay for only six and two-thirds feet for its track, then can the remaining portion between the tracks and the remaining portion of the two feet provided for in said act be taxed against the property fronting on said street?' The rights of the property owners and the rights of the city and the rights of the railway company having been determined under pre-existing law, the abutting property owners on the street would probably be assessed for the remaining portion between the tracks after the six and two-thirds feet had been paved by the railway company.

"Considering the fourth submission: 'Can the costs and expenses of instituting and laying said drainage pipes be taxed against the property fronting and abutting on said street along which said pipes are laid?' Yes, we think it clearly provided for in section 1 of the act under consideration, which reads as follows: 'The mayor and council of cities of the first class are hereby empowered to establish and change the grade of any streets, avenues, lanes, alleys and other public places in such cities, and to permanently improve the same by paving, macadamizing, curbing, guttering and draining, the same, including the installing of all manholes, catch basins and necessary drainage pipes.' It also appears from section 5 of the act that authority is expressly given for these and all other purposes. That portion of section 5 applicable reads as follows: 'As soon as the contract is let and the cost of such improvement, which will also include all other expenses incurred,' etc. It is apparent from the language of the statute that the matter of drainage, as well as all other expenses, was intended to be and is covered by the act.

"Considering the fifth submission: 'Can an assessment be

made against a steam railroad company to pay for that portion of its right of way more than the portion between the rails and two feet on each side thereof, and, if so, according to what plan shall this assessment be levied?' From the agreed statement of facts it does not appear that prior to April 17, 1908, there existed any contractual relations between the steam railroad company and the city. This being true, the liability of the steam railroad company must be determined from the language of the act. The third proviso of section 1 of the act under consideration places the steam railway on the same basis as the street railway and binds it to no greater duty or liability in this respect. These railroad companies do not own their several rights of way, but simply occupy them and have easements therein obtained from the public. If in any case they have purchased and own the land occupied by and adjoining the right of way, there is no reason why in such cases the assessments should not be made against the land so owned, and in this event the plan of assessment would be the same as against the individual—the natural person. This rule applies equally to street railways who own any portion of their right of way and abutting lands.

"Considering the sixth submission: 'Has the mayor and council the right under such act to designate several materials and provide for the making of bids upon each of the several materials so designated in accordance with plans and specifications and estimates provided therefor, or is the duty of the mayor and council to select one particular material and provide in said resolution for the securing of bids for the construction of said improvements from the one designated material?' It is the duty of the mayor and council to select under one resolution and for one contract one particular kind of material. Section 4 of the act provides, among other things, as follows: 'After the expiration of the time for objections or protests on the part of the property owners, if no sufficient protest be filed, or on receipt of petition for such improvement signed by the owners of more than one-half in area of the land to be assessed, if such petition shall be found to be in proper form, and properly executed, the mayor and council shall adopt a resolution reciting that no such protest has been filed, or the filing of such petition, as the case may be, and expressing the determination of the council to proceed with the improvement, defining the extent, character and width of the improvements, stating the material to be used, * * * ' etc. It is evident from

the fact that if a resolution provided for different materials, such as asphalt, macadam, cement, or wooden blocks, it would be indeterminate as to which was to be used, and while some of the property owners might want cement, others asphalt, and so forth, and each individual owner, not knowing what material the paving would be constructed of, would enter a protest, and thus confusion would be created; and the obvious purpose of the law, being the improvement of the city, would be nullified and improvement stopped.

"Considering the seventh submission: 'Can the city make a general levy for the payment of the costs and expenses of the improvements of said street intersections against all of the property of said city?' This question must be determined from the construction of section 3 of the act considered. By the terms of this act, it appears to be contradictory, and the court must therefore determine which part of the act is in force. The act provides, first: 'The lots, pieces, or parcels of land fronting and abutting on any such improvement shall be charged with the cost thereof to the center of the block.' This appears plain and needs no explanation, but further on this language is used: 'Provided, that in the case of an alley extending through a block, then the assessment shall be made upon the property extending from the exterior of the block to such alley, and when triangular or other irregular shaped lots or tracts are to be assessed for any such improvement, any part of the costs of such improvements in excess of the benefits accruing to such lots or tracts shall be borne by the city and paid from the street and bridge fund of said city. * * * Provided, further, that the mayor and council may in their discretion provide for the payment of the cost of improving street intersections and alley crossings, which costs shall be provided for and paid by said city, and for the purpose of paying said expense a separate and special levy shall be made and entered against all the property of the said city at the next annual tax levy after such estimate is made, which said expense shall embrace the *pro rata* part of the expense of advertising and of making profiles and specifications, together with the expenses chargeable by the city engineer, superintendents and in all other respects, but the city may at its option arrange * * *' the method of payment.

"It is somewhat difficult to harmonize the two provisions of this section. The first provides that abutting property shall be charged with the cost, and the second that in alleys not penetrating

the center of the block, and in triangular and irregular shaped lots, that the costs shall be borne by the city in excess of the benefits; and, again, that the mayor and city council may in their discretion provide for the payment of the cost of improving the street intersections and alley crossings, and the method by which the same shall be paid.

"The different provisions of this section can not all stand. We must, therefore, determine what part of this section controls. The general proposition stated, that the lots and parcels of land fronting and abutting on the improvements shall pay, is attempted to be modified by the provision that the mayor and city council, in the use of their discretion, may direct that street intersections and alley crossings may be made a general burden of taxation upon the entire people of the city. The general provision contained in section 3 of the act must control, and the property benefited must pay the expenses. Section 272, Bunn's Annotated Constitution, is as follows: 'The Legislature may authorize county and municipal corporations to levy and collect assessments for local improvements upon property benefited thereby, homesteads included, without regard to a cash valuation.' It would therefore appear that the power of the Legislature is controlled by this constitutional provision which places an inhibition upon the Legislature. That part of section 3 of the act of April 17, 1908, giving to the mayor and city council discretionary power to levy a special tax upon all taxable property of the municipality to pay the expenses of improvement of street intersections and alley crossings, is in contravention of the above article of the Constitution and is therefore void.

"Referring to the first submission: 'Can assessments be made against the property fronting on the street to be improved according to the benefits thereof in quarter block districts, or can any assessment be legally made against such property under the act of the Legislature of the state of Oklahoma, dated April 17, 1908, entitled "An act to provide for the improvement of streets and other public places within cities of the first class, by grading, paving, macadamizing, curbing, guttering and draining the same, and declaring an emergency." ' This submission raises, perhaps, every question that could be raised under the law: Is the law valid? Does it comply with the provisions of the Constitution? Is it in harmony with the Constitution? Or does it conflict with

Vol. 22—18

the provisions with the organic act? A discussion of this proposition would necessarily involve the power and authority of the Legislature to declare and determine what is an emergency measure. The court is not certain that it was the intention of the parties submitting this question that it should reach so broad a field of investigation, and yet this submission involves every possible question that could be raised. Answering the first inquiry, the court announces that, by virtue of the act itself, and under the language of section 3, that the assessments can be properly made and perhaps only be made in quarter block districts, assessing against each lot the amount of benefit that the lot would receive from the improvements. This has been particularly decided by our Supreme Court in *Kerker v. Bocher*, 20 Okla. 729, 95 Pac. 981. As to whether 'any assessment can be legally made against such property under the act of the Legislature of the state of Oklahoma, dated April 17, 1908,' the court has some doubts and misgivings.

"This submission clearly raises the question of the power of the Legislature to declare what is and what is not an 'emergency.' Was it the intention and purpose of the Constitution makers to empower the Legislature with arbitrary authority to declare an emergency, or was it the intention and purpose of the Constitution makers to only confer upon the Legislature the power to determine and pass laws when an emergency actually existed? If unlimited power was intended to be conferred upon the Legislature, then the entire effects of the Constitution were destroyed; the initiative and referendum must go, and we return not only to the ordinary forms of legislating in other states, but we retrograde and give to the Legislature of this state greater power than possessed by the Legislature of any other state in the Union, save perhaps, Kansas—and her Constitution is different. Under the provisions of the Constitution (section 131, Bunn's Annotated Const.) we find the following language: 'No act shall take effect until ninety days after the adjournment of the session at which it was passed.' We then find an exception as follows: 'Except enactments for carrying into effect provisions relating to the initiative and referendum, or a general appropriation bill, unless in case of emergency to be expressed in the act. * * * An emergency measure shall include only such measures as are immediately necessary for the public peace, health or safety, and shall not include the granting of franchises or license to a corporation or individual

to extend longer than one year, nor provision for the purchase or sale of real estate, nor the renting or incumbering of real property for a longer term than one year.'

"From the above it appears there are three grounds for which the Legislature may pass an emergency measure: First the public peace, which does and must necessarily mean an internal uprising of the people, or of the people of some locality, which threatens the peace and welfare of the people in that community or the people generally. Public safety ordinarily means a protection against an invasion or threatened invasion from a foreign foe. If either of these existed, the emergency measure would be justified. And, again, the preservation of the public health. This would naturally mean such condition as from pestilence or contagion would require the intervention and immediate necessity for the protection of the people. It will not be contended that the public peace was being disturbed or in danger. It can not be said that the safety of our people was in danger. Then, if an emergency existed, it was by virtue of the need for the preservation of the health of the people of the state. It can not well be contended that this last proposition is correct, from the fact that the act of April 17, 1908, was substantially a re-enactment of the existing laws of the territory which by virtue of the provisions of the Constitution, remained active and in force until changed by the Legislature or by law. If, then, the same protection was given to the health of the people by reason of existing laws as was given to them by reason of the present enactment, then no emergency existed, and the Legislature had no right, power, or authority to declare an emergency. It is, in the opinion of the court, under the language of the Constitution, insufficient for the Legislature to say, in the language of the Constitution, 'immediately necessary for the preservation of the public peace, health or safety,' for that other part of the same section says, 'unless, in case of emergency, to be expressed in the act.'

"It is, therefore, in our opinion, insufficient for the Legislature to quote simply the language of the Constitution and rely upon that; it must give, if we give full force to its meaning and purport, a reason for the emergency—state what it is; no reason being given in this enactment, but simply a quotation from the Constitution: 'Section 13. An emergency is hereby declared, by reason whereof it is immediately necessary for the preservation of the public peace, health and safety that this act shall take effect

from and after its passage and approval.' That such declaration upon the part of the Legislature does not comply with the provisions of the Constitution. If that part of the Constitution requiring the emergency 'to be expressed in the act' has a meaning, it is that the Legislature shall express in the body of the act the reason for the emergency, and, if they do not, the act, in our opinion, is void as an emergency act, and the court so holds.

"Was it the intention and purpose of the framers of our government, our Constitution builders, to institute, formulate, and promulgate the doctrine of initiative and referendum, and to then place in the power of those who were chosen to make our laws the power to disobey and nullify it? If our legislators have the right to declare an emergency in any event, whether it exists or not, then the doctrine of the initiative and referendum was simply a blindfold to deceive the people and carry an election. It means more than this; it means that there must be a reason, and that public health, the public peace, the public safety, one or the other, must be involved; and it must be shown in the body of the bill the reasons why this condition existed, otherwise an emergency cannot be declared. Can the Legislature declare an emergency when none exists? Was that power intended to be conferred upon them by our Constitution makers? It is the opinion of the court it was not; and it is also the opinion of the court that in declaring the act under consideration an emergency measure, that the Legislature exceeded its authority."

That portion of the ordinance relating to paving is in section 4, which is as follows:

"Wherever the line of the railway company's tracks traverse any street upon which the pavement is constructed it shall be the duty of the said company after laying its tracks, to restore such pavement wherever injured or destroyed, taken up or removed, to its previous condition, and whenever the said city of Oklahoma City shall hereafter pave or repave any street upon which said line of street railway is constructed it shall be the duty of the said railway company to construct or pay the cost of construction of a total width in area along the streets so occupied of six and two-thirds (6 2-3) feet for each track occupying such street, according to specifications adopted by said council. And to maintain such pavement in good condition during the time such tracks may remain in such streets except when the duty of maintenance of such pavement may rest

upon any contractor constructing such pavement. Provided, that the said railway company may construct along its tracks detachable curbs or blocks of bricks of sufficient width to enable the said company to take up or repair its tracks or rails without disturbing any pavement of a cement or asphaltic character used on any such street. Upon final determination of the city council to pave any such street it shall cause the city clerk to give a written notice of such determination to said railway company, and the said railway company shall, if it desires to construct said pavement itself so notify the city clerk in writing before the contract for the construction of such pavement is awarded; and it shall thereupon be the duty of the said railway company upon making such election to execute its part of such paving in conjunction with the progress of the same work under the direction of the city. In the event of the said railway company failing to give such notice, or failing to proceed with the work, if such notice is given, the said work may be executed by the city and charged to the said railway company, by an assessment of benefits as provided by law for the assessments of benefits 'to individual abutters' and the measure of the liability of the said railway company shall be the cost of construction by contract of that portion of the pavement hereby made the duty of said railway company to construct. And the said assessment shall be levied and collected in the same manner as the assessments of individuals and all of the property of said railway company shall be liable therefor. The said railway company hereby by the acceptance of this ordinance assents to the collection of such assessments in the manner herein provided for."

*W. R. Taylor,* for plaintiff in error.
*Flynn & Ames* and *T. G. Chambers,* for defendant in error.

Williams, C. J. (after stating the facts as above). The first question presented for our consideration is whether or not the court erred in holding that the contract entered into between the defendant and the plaintiff, by ordinance duly passed by the defendant municipality on February 8, 1902, and thereafter in due time accepted by the street railway company, exempted said company from complying with the provisions of the act of the Legislature of April 17, 1908 (Acts 1908, p. 166, c. 10, § 1). Said act provides:

"That all the street railway companies operating within the

said city shall be required to pave, macadamize, curb, gutter or drain the portion of their tracks situated in said streets and two feet on each side thereof, as the remainder of said streets may be so improved, or such other material as the city may require, and when there are two or more tracks of any railway or street railway company upon one street then said company shall be required to gravel, pave, or macadamize as the city may require also the space between said tracks."

"A Corporation is a creature of the law, having certain powers and duties of a natural person. Being created by the law, it may continue for any length of time which the law prescribes." (Wilson's Rev. & Ann. St. Okla. 1903, § 930.)

"A corporation can only be created by authority of a statute. But the statute may be special for a particular corporation, or general for a number of corporations." (Id. § 931.)

"Every grant of corporate power is subject to alteration, suspension or repeal, in the discretion of the Legislature." (Id. § 932.)

"Public corporations are formed or organized for the government of a portion of the territory (state). Such corporations are regulated by local statute." (Id. § 936.)

At the time the ordinance of February 6, 1902, was passed, sections 931, 932, 933, and 936, *supra,* were in force, and the question arises as to whether or not, under said provisions, the power was reserved in the Legislature to repeal, amend, or modify, or place an additional burden upon any franchise granted by such municipal corporation. Section 31, art. 4, of the Constitution of California of 1849, provides as follows:

"Corporations may be formed under general laws, but shall not be created by special act. All laws now in force in this state concerning corporations, and all laws which may hereafter be passed pursuant to this section, may be altered from time to time, or repealed."

The Legislature of California, on the 14th day of April, 1853 (Laws 1853, p. 87, c. 65), and on the 30th day of April, 1855 (Laws 1855, p. 205, c. 162), passed acts providing for the formation of corporations for certain purposes, and on the 22d day of April, 1858 (Laws 1858, p. 218, c. 262), these acts were extended so as

to include the formation of corporations for the purpose of supplying cities, counties, and towns with water. Under this extension water companies were empowered to acquire lands and water for their works by purchase and condemnation, and, subject to the reasonable direction of the public authorities, to use streets, ways, alleys, and public roads for laying their pipes; but it was expressly provided by an amendment enacted in 1861 (Laws 1861, p. 228, c. 227), "that all canals, reservoirs, ditches, pipes, aqueducts, and all conduits * * * shall be used exclusively for the purpose of supplying any city or county, or any cities or towns, in this state, or the inhabitants thereof, with pure, fresh water."

Section 4 of the act of 1858 is as follows:

"All corporations formed under the provisions of this act, or claiming any of the privileges of the same, shall furnish pure, fresh water to the inhabitants of such city, and county, or city or town, for family uses, so long as the supply permits, at reasonable rates, and without distinction of persons, upon proper demand therefor, and shall furnish water, to the extent of their means, to such city and county, or city or town, in case of fire or other great necessity, free of charge. And the rates to be charged for water shall be determined by a board of commissioners, to be selected as follows: Two by such city and county, or city or town authorities, and two by the water company, and in case that four can not agree to the valuation, then, in that case, the four shall choose a fifth person, and he shall become a member of said board; if the four commissioners can not agree upon a fifth, then the sheriff of the county shall appoint such fifth person. The decision of a majority of said board shall determine the rates to be charged for water for one year, and until new rates shall be established. The board of supervisors, or the proper city or town authorities, may prescribe such other proper rules relating to the delivery of water, not inconsistent with this act and the laws and Constitution of this state."

The Spring Valley Waterworks Company was formed on the 19th day of June, 1858, under the provisions of the act of April 22, 1858, and thereafter expended a very large amount of money in the erection of extensive and substantial works for the supply of the city and county of San Francisco with water. In January, 1878, the board of supervisors of the city and county appointed

Isaac B. Friedlander and H. B. Williams, and the company appointed W. F. Babcock and Charles Webb Howard, and these four afterwards appointed Jerome Lincoln, to constitute a board of commissioners to determine, under the provisions of said section 4, the rates to be charged by the company for water. This board met and fixed the tariff of rates to go into effect on the 1st day of June, 1878. In July of the same year the said Freidlander died. By his death a vacancy was created in the board, which was never filled. In the year 1879 the people of California adopted a new Constitution, which went into effect on the 1st day of January, 1880. Article 14, §§ 1 and 2, are as follows:

"Section 1. The uses of all water now appropriated, or that may hereafter be appropriated, for sale, rental, or distribution, is hereby declared to be a public use, and subject to the regulation and control of the state, in the manner to be prescribed by law: Provided, that the rates or compensation to be collected by any person, company or corporation in this state for the use of water supplied to any city and county, or city or town, or the inhabitants thereof, shall be fixed, annually, by the board of supervisors, or city and county, or city or town council, or other governing body of such city and county, or city or town, by ordinance or otherwise, in the manner that other ordinances or legislative acts or resolutions are passed by such body, and shall continue in force for one year and no longer. Such ordinances or resolutions shall be passed in the month of February of each year, and take effect on the first day of July thereafter. Any board or body failing to pass the necessary ordinances or resolutions fixing water rates where necessary, within such time, shall be subject to peremptory process to compel action at the suit of any party interested, and shall be liable to such further process and penalties as the Legislature may prescribe. Any person, company or corporation collecting water rates in any city and county, or city or town in this state, otherwise than as so established shall forfeit the franchise and water works of such person, company or corporation to the city and county, or city or town, where the same are collected, for the public use.

"Sec. 2. The right to collect rates or compensation for the use of water supplied to any county, city and county, or town, or the inhabitants thereof, is a franchise, and can not be exercised except by authority of and in the manner prescribed by law."

Under these sections of said Constitution, and the legislation based thereon, the board of supervisors claimed the right and power to fix the rates to be charged by the company for water, and refused to appoint a member to fill the vacancy occasioned by the death of Freidlander, the former incumbent. An action was begun in the Supreme Court of the state for a writ of mandamus requiring the board of supervisors to take action in the matter and fill the vacancy. The court on final hearing refused the writ and dismissed the petition. Writ of error was brought by the waterworks company to the Supreme Court of the United States to review that judgment, and the question there involved was whether or not waterworks companies in California, formed under the act of 1858 before the adoption of the Constitution of 1879, had a right, which the state is prohibited by the Constitution of the United States from impairing or taking away, to charge their customers such prices for water as may from time to time be fixed by a commission made up of two persons selected by the company, two by the public authorities of the locality, and if need be, a fifth selected by the other four or by the sheriff of the county.

In the case of *Spring Valley Waterworks v. Schottler*, 110 U. S. 352, 4 Sup. Ct. 50, 28 L. Ed. 176, Mr. Chief Justice Waite, in delivering the opinion of the court, said:

"The Spring Valley Company is an artificial being created by or under the authority of the Legislature of California. The people of the state, when they first established their government, provided in express terms that corporations, other than for municipal purposes, should not be formed except under general laws, subject at all times to alteration or repeal. The reservation of power to alter or repeal the charters of corporations was not new, for almost immediately after the judgment of this court in the Dartmouth College Case (*Dartmouth College v. Woodward*, 4 Wheat. 518, 4 L. Ed. 629), the states, many of them, in granting charters, acted on the suggestion of Mr. Justice Story in his concurring opinion (page 712 of 4 Wheat. [4 L. Ed. 629]), and inserted provisions by which such authority was expressly retained. Even before this decision it was intimated by the Supreme Judicial Court of Massachusetts in *Wales v. Stetson*, 2 Mass. 143, 3 Am. Dec. 39, that such

a reservation would save to the state its power of control. In California the Constitution put this reservation into every charter, and consequently this company was from the moment of its creation subject to the legislative power of alteration, and, if deemed expedient, of absolute extinguishment as a corporate body.

"Water for domestic uses was difficult to be got in some parts of the state. Large amounts of money were needed to secure a sufficient supply for the inhabitants in many localities, and as a means of combining capital for such purposes the act of 1858 was passed. Other statutes had been enacted before to effect the same object, but it is said they were not such as a company with capital enough to supply San Francisco was willing to accept. The act of 1858 was thought sufficiently favorable, and the Spring Valley Company, after organizing under it, expended a large amount of money to provide the means of supplying the territory on which San Francisco is built, and make it possible to support a great population there. All this was done in the face of the limitations of the Constitution, on the power of the Legislature to create a private corporation and put it beyond the reach of legislative control, not only as to its continued existence, but as to its privileges and franchises. One of the obligations that the company assumed was to sell water at reasonable prices, and the law provided for a special commission to determine what should be deemed reasonable both by the consumers and the company; but there is nowhere to be found any evidence of even a willingness to contract away the power of the Legislature to prescribe another mode of settling the same question, if it should be considered desirable. In the *Sinking Fund Cases*, 99 U. S. 700, 25 L. Ed. 496, it was said that whatever rules for the government of the affairs of a corporation might have been put into the charter when granted could afterwards be established by the Legislature under its reserved power of amendment. Long before the Constitution of 1879 was adopted in California, statutes had been passed in many of the states requiring water companies, gas companies, and other companies of like character to supply their customers at prices to be fixed by the municipal authorities of the locality: and, as an independent proposition, we see no reason why such a regulation is not within the scope of legislative power, unless prohibited by constitutional limitations or valid contract obligations. Whether expedient or not is a question for the Legislature, not the court.   *   *   *   The corporation was created by the state. All its powers came from the

state, and none from the city or county. As a corporation it can contract with the city and county in any way allowed by law, but its powers and obligations, except those which grow out of contracts lawfully made, depend alone on the statute under which it was organized, and such alterations and amendments thereof as may, from time to time, be made by proper authority. The provision for fixing rates cannot be separated from the remainder of the statute by calling it a contract. It was a condition attached to the franchise conferred on any corporation formed under the statute, and indissolubly connected with the reserved power of alteration and repeal."

In the case of *Union Passenger Railway Company, Plaintiff in Error, v. Philadelphia, Defendant in Error,* 101 U. S. 528, 25 L. Ed. 912, Mr. Justice Clifford, in delivering the opinion of the court, said:

"Stipulations in a statute of a state, exempting certain property, rights, or franchises from taxation, or engaging that the same shall be taxed only at a certain rate, if made for a valuable consideration received by the state whose Legislature enacted the stipulation, is a contract, and, as such, comes within the rules of decisions specifying the description of contracts entitled to protection from modification or repeal under the guaranty of the tenth section of the first article of the Constitution.

"Exemptions of the kind, however, are to be strictly construed, the rule being that the right of taxation exists unless the exemption is expressed in clear and unambiguous terms, and that, in order that it may be effectual, it must appear that the contract was made in consequence of some beneficial equivalent received by the state; it being conceded that, if the exemption was granted only as a privilege, it may be recalled at the pleasure of the Legislature. Cooley, Const. Lim. (4th Ed.) 342; Cooley, Tax. 146.

"Companies were created by the Legislature of the state, more than 30 years ago, for running street cars in the streets of the plaintiff city, whose charters made it necessary that the managers should obtain the consent of the city councils before they commenced to use and occupy the streets for that purpose. Ordinances were accordingly passed by the city authorities which required companies organized under such statutes to pay for the use of the city

a license fee of $30 for each car intended to be run.   Subsequent charters of the kind were granted by the Legislature, which did not contain any provision requiring the companies or their agents to procure the consent of the authorities of the city before they could use the public streets for the running of their passenger cars.

"These companies denied the validity of the license charge, which gave rise to litigation and to new legislation, by which authority was given to the city councils to provide by ordinance for the proper regulation of omnibuses or vehicles in the nature thereof, and to that end it was enacted that they might, from time to time, pass ordinances to provide for the issuance of licenses to as many persons as may apply to keep and use omnibuses or vehicles in the nature thereof, and to charge a reasonable annual or other sum therefor, and to provide for the punishment of the owners and drivers of the same for any violation of the provisions of the ordinances to be created by virtue of the authority conferred.   Sess. Laws Pa. 1850, p. 469.

"Authority was, by that act, expressly vested in the city authorities to pass ordinances upon the subject therein described, and to charge a reasonable annual license fee for the license or other sum for the same.   Pending the period during which that enactment continued to be in operation, the Legislature of the state passed the act incorporating the defendant company, with the powers, privileges, duties and obligations expressed in the act of incorporation.   Sess. Laws Pa. 1864, p. 300.

"Corporate privileges 'of the usual character are, by the charter, granted to the company, and the tenth section provides that whenever their dividends shall exceed six per centum per annum on the par value of the capital stock, the company shall pay for the use of the city a tax of six per centum on such excess over six per centum on the par value, and that they shall also pay 'such license fee for each car run by the company as is now paid by other passenger railway companies.'

"Railway companies running cars on the streets of the city were required to pay at the time the defendant company was incorporated, for each and every car intended to be run, the annual license fee of $30, as appears by the ordinance then in force and fully set forth in the agreed statement of facts.   Annual payments

to that amount, it seems, were made by the defendant company, which may be inferred from the fact that the plaintiff city makes no claim for any deficit during that period.

"Coming to the matter in controversy, it appears that the Legislature on the 11th day of April, 1868, passed the act which is the principal subject of controversy. Section 1 provides that the passenger railway corporations of the city shall pay annually to the city in the month of January the sum of $50, as required by their charters, for each car intended to run over their roads during the year, and that they shall not be obliged to pay any larger sum; and the same section provides that the city shall have no power to regulate such companies unless so authorized by the laws of the state. Sess. Laws Pa. 1868, p. 849.

"Regular payments, as required, were made by the defendant company until the year 1875, when they refused to pay any greater sum than $30 per year for each car run. Payment of the excess beyond $30 being refused, the authorities of the city instituted the present suit in the common pleas to recover the balance as claimed. Service was made, and the parties having appeared, filed the agreed statement of facts exhibited in the transcript, hearing was had, and the court of original jurisdiction rendered judgment in favor of the plaintiff city for the sum of $4,218.60. Dissatisfied with the judgment, the defendant company removed the cause into the Supreme Court of the state, where the judgment was affirmed. Still not satisfied, the defendant company removed the cause into this court, and assigns for error the following causes: (1) That the act of the Legislature, defining the duties and liabilities of railway companies, is in conflict with that provision of the Constitution which prohibits a state from passing any law impairing the obligation of contracts. (2) That the judgment of the court below is in conflict with that provision of the Constitution. * * * When the company was incorporated, the charter, as before remarked, contained the provision providing for the payment of a 6 per cent. tax on excess of dividends over 6 per cent. on the par value of the stock, and the further provision that the company shall also pay such license for each car run as is now paid by other passenger railway companies in the city. What the defendants contend is that the closing enactment of the section amounts to a contract that the railway company shall never be required to pay any greater license fee than was then required of such companies running passenger cars on the streets of the city.

Other railway companies at that time paid an annual license of $30, and the defendants insist that the act of the Legislature increasing the license to $50 per annum is unconstitutional and void.

"Two answers are made to that proposition by the plaintiff city, either of which is sufficient to show that the judgment must be affirmed: (1) That the language of the act of incorporation referred to does not amount to a contract of any kind, and certainly not to such a contract as that attempted to be set up by the defendants. (2) That even if the language employed in the charter is sufficient to amount to a contract that the license charge should not exceed the amount paid at the date by other such companies, still it can not benefit the defendants, for the reason that the Constitution of the state in force when the act of incorporation was passed provides that the Legislature shall have the power to alter, revoke, or annul any charter of incorporation hereafter conferred by or under any special or general law whenever in their opinion it may be injurious to the citizens, subject only to the condition that the alteration, revocation, or annulment shall be made in such manner that 'no injustice shall be done to the corporators.' Article 1, § 26, Purdon's Dig. (9th Ed.) p. 17. * * * Acts of incorporation, granted subsequently to the adoption of the Constitution, must be construed as if the provision of the instrument in question was embodied in the charter."

In the case of *Sioux City Street Railway Co. v. City of Sioux City et al.*, 138 U. S. 105, 11 Sup. Ct. 227, 34 L. Ed. 899, Mr. Justice Blatchford, in delivering the opinion of the court, said:

"The Sioux City Railway Company became a corporation on December 6, 1883, under the general incorporation laws of the state of Iowa. On the 12th of December, 1883, the city of Sioux City, by an ordinance of the city council, conferred upon the company the right to locate, operate, construct, and maintain street railways upon and along certain streets in the city, on the terms and conditions specified in such ordinance. Section 11 of the ordinance was as follows: 'Sec. 11. Whenever, by resolution of common council, any street or part of street on which said track shall be laid and operated shall be ordered paved or macadamized, either at the expense of the city or owners of abutting property, then the said proprietors of said street railway shall pave or macadamize in the time and manner directed the space between the rails,

and shall thereafter keep the same between the rails in good repair, and shall keep in good condition and repair the space between the tracks on all bridges that they cross.' On the 18th of December, 1883, the company accepted the ordinance. Prior to March 18, 1884, the company had expended over $10,000 in constructing tracks on certain streets and for other purposes, and had contracted for material and supplies for constructing other tracks, and had its street railway in operation on certain streets, in accordance with the terms of the ordinance.

"On March 15, 1884, the Legislature of Iowa passed an act entitled 'An act granting additional powers to certain cities of the first class, with reference to the improvement of streets, highways, avenues or alleys, and to provide a system of payment therefor.' The sixth section of that act provided as follows: 'All railway companies and street railway companies in cities of the first class, as provided in section one of this act, shall be required to pave or repave between rails and one foot outside of their rails, at their own expense and cost. Whenever any street, highway, avenue or alley, shall be ordered paved or repaved by the council of any such city such paving or repaving between and outside of the rails shall be done at the same time and shall be of the same material and character as the paving or repaving of the street, highway, avenue or alley upon which said railway track is located, or of such other material as said council may order, and when said paving or repaving is done said companies shall lay in the most approved manner the strap or flat rail. Such railway companies shall keep that portion of the streets, highways, avenues or alleys between and one foot outside of their rails up to grade and in good repair, using for such purpose the same material with which the street highway avenue or alley is paved upon which the track is laid, or such other material as said council may order.' Laws 1884. p. 22, c. 20.

"On January 15, 1886, the city of Sioux City became a city of the first class, under the statutes of Iowa, and has continued to be such.

"On the 11th day of May, 1886, the city council passed an ordinance entitled 'An ordinance providing for the paving of the streets between the rails of railways and street railways located thereon, and defining the manner of making special assessments to defray the cost and expense thereof and the manner of enforcing and collecting the same,' the first section of which provided as

follows: 'Section 1. That whenever the city council,' etc., shall cause to be paved any street, avenue or alley whereon any railway has or shall be located and laid down, they shall also order and provide by resolution that the company or persons owning said railway or street railway pave said street, avenue or alley between the rails of said railway or street railway, and one foot each side of the rails thereof, at their own expense and cost: Provided, that the provisions of this section shall not in any manner be construed to affect any rights accrued or existing in favor of said railway companies or street railway companies under anw franchise or license heretofore granted under any ordinance heretofore adopted by said city council.' Under this ordinance, and a subsequent one passed May 25, 1886, and a resolution passed August 31, 1886, the city council ordered certain streets to be paved, including those parts as to which the assessments involved in this suit were imposed, and provided for assessing to the street railway company the cost of paving the space between the rails and one foot outside thereof.

"The assessment of a special tax against the company for the cost of paving the space outside of the tracks was made December 27, 1886. Prior to that time, the company had paid for so much of the paving as lay between the rails of its tracks. In proper time after the resolution of August 31, 1886, was served upon the company, it filed its written objections thereto, as follows: 'The Sioux City Street Railway Company objects to the resolution ordering the assessment of a special tax against said company for the cost of paving one foot outside of its railway tracks in improvement districts 2 and 3. It objects to having the cost of paving one foot outside of the railway track charged to it, or to have same in any manner assessed against it or against its property, and to having any resolution or ordinance passed charging the cost of said paving to it, or making any assessment against it or against its property, or seeking in any manner to collect said cost from it, or making same a lien upon the title to any of the property, by any ordinance, resolution, or confirmation purporting to charge such cost against said company or its property; that, by the terms of the charter granting the company the right to locate, construct, and maintain its said railway, it was expressly provided that the company should only be required to pave so much of the street wherein the track was constructed as should lie between the rails of said track; that the city of Sioux City thereby expressly contract-

ed and agreed that this company should have the right to locate, construct, operate, and maintain its said tracks in said streets, and should only be required to pave or keep in repair that portion thereof lying within the rails of its said tracks; that the said company, relying upon the charter and the ordinance granting it the right to locate and construct the tracks on the said streets herein named and the provisions and conditions thereof, located, constructed, and has since operated its track and railway on the said streets, and has in all respects complied with all the conditions and requirements imposed upon it by said city by the said ordinance; and that said assessment of costs of paving one foot outside the rails of said railway tracks is a violation of the grant and contract of said city to and with this company, and is illegal and void.' Notwithstanding this, the city council, on the 15th day of March, 1887, overruled the objections of the company, and confirmed the assessment.

"Under this state of facts, the company, on the 30th day of May, 1887, filed in the district court of the county of Woodbury, in the state of Iowa, its petition against the city of Sioux City and the city council of Sioux City, setting forth the foregoing facts, and averring as follows: 'That by the terms of the charter granting to the plaintiff the right to locate, construct, and maintain said street railway, it was expressly provided that plaintiff should only be required to pave so much of the street whereon it constructed and operated its street railway as should lie between the rails of its said tracks; and the city thereby expressly contracted and agreed with plaintiff that, in consideration of its construction and operating the said street railway over said streets, it should have the right to do so, and only be required to pave and keep in repair so much of the street as lies between its rails; and said company relying on the ordinance and contract of said city located and constructed at great expense said track, and has ever since operated and maintained the same, and that said ordinance and resolution requiring the plaintiff to pay the cost of paving one foot outside of the track of the railway is in violation of said contract granting it the right to locate and construct the said railway. The said city council erred in passing said ordinance and resolution requiring plaintiff to pay the cost of paving one foot outside of their tracks, and erred in overruling their objections to the special charges and assessments made against said company for said cost

of such paving, and in determining that the said cost of such paving should be charged to said plaintiff and against the property, and erred in confirming said special assessments.' The petition prayed for the issuing of an order for a writ of *certiorari* to the city council and for a reversal of its action.

"On the 11th of February, 1889, the petition was amended by averring that section 6 of the act of March 15, 1884, in so far as it sought to impose upon the company the paving of one foot outside of its track, or to impose upon it the cost thereof, was a violation of subdivision 1 of section 10 of article 1 of the Constitution of the United States, as impairing the obligation of a contract, and that the ordinance of May 11, 1886, and the resolutions of August 9, 1886, and December 27, 1886, were a violation of the same subdivision.

"The defendants filed a demurrer to the petition and amendment, as follows: 'That the facts stated herein do not entitle the plaintiff to relief demanded for that: (1) That said ground of relief, as stated in said petition and amendment thereto, is that the action of said city and its city council, in assessing the cost of paving of one foot outside the rails of the tracks of plaintiff's railway, impairs the obligation of the contract made between the city and plaintiff, while said petition and the amendment thereto discloses that such is not the effect of said action of the city. (2) That said petition and the amendment thereto shows that in making said assessment, the city of Sioux City, by its common council, only complied with the provisions of the law of the state of Iowa authorizing said assessment, and then in force. (3) That the said plaintiff took its charter as a corporation from the state, subject to the reserve power of the state to abridge or modify said charter, and to regulate, withhold, or impose any other conditions upon any franchise obtained by said corporation; and the said plaintiff took said franchise and ordinance from said city subject to the rights of said city to make any charge or assessment against its property which the Legislature might provide by statute.'

"The district court sustained the demurrer, dismissed the petition, and confirmed the assessments. The plaintiff appealed to the Supreme Court of Iowa, which affirmed the judgment, its opinion being reported in 78 Iowa, 367, 43 N. W. 224.

"Section 1090 of the Code of Iowa, which was in force when the railway company became incorporated, provided as follows:

'Sec. 1090. The articles of incorporation, by-laws, rules and regulations of corporations hereafter organized under the provisions of this title, or whose organization may be adopted or amended hereunder, shall, at all times, be subject to legislative control, and may be, at any time, altered, abridged, or set aside by law, and every franchise obtained, used or enjoyed by such corporation may be regulated, withheld, or be subject to conditions imposed upon the enjoyment thereof, whenever the General Assembly shall deem necessary for the public good.'

"The Supreme Court of Iowa, in view of section 1090, held that the city of Sioux City, by granting the authority to construct and operate the railway on the condition of paving between the rails, did not limit its authority to make and enforce other regulations and requirements, as authorized by section 1090; that although, by the contract, the company bound itself to pave between the rails, the city did not bind itself not to exercise the authority conferred upon it by section 1090 to impose other conditions upon the exercise of the franchise of the company which, in the judgment of the city, might be required for the public good; and that the city was authorized to impose on the company the burden of the additional paving outside of the rails.

"No question is raised as to the regularity or legality of the proceedings for assessment for the cost of paving outside of the track, except the question of the power of the city to impose the assessment, in view of the franchise granted to the company. The only contention is that, in view of the provisions of section 11 of the ordinance of December 12, 1883, there was no power in the city to require the company to pave anywhere except between the rails. On the other hand, the defendants contend that section 11, while requiring the company to pave between the rails, does not provide that it shall be required to pave only between the rails. Reference is also made by the defendants to section 8 of the ordinance of December 12, 1883, which provides for the payment by the company into the city treasury of an annual license of $25 on each car used by it, 'in addition to the other taxes lawfully assessed and collected'; and it is contended that, as the Legislature subsequently passed a general law requiring all street railway companies to pay for the cost of paving one foot outside of the rails, this tax or assessment was charged lawfully against the company. It is also contended that, no matter what the provisions of the ordi-

nance were, it was within the power of the Legislature to enact laws imposing an additional tax upon the company, and within the power of the city, acting under such law, to make the charge upon the property of the company; and that, under section 6 of the act of March 15, 1884, the assessment and tax in question were made against the property of the company, and the city merely carried out the direction of the statute, and did not impose the additional burden by its own voluntary act.

"The company took its franchise subject to such legislation as the state might enact. This is plain from the provision of section 1090 of the Code. The company took its charter subject to the provisions of that section. The General Assembly deemed it necessary for the public good to require street railways to pay for the paving of one foot outside of the tracks, probably upon the view that it was right that they should be required to pave that part of the street which they used almost exclusively. It was not in the power of the city, by any contract with the company, to deprive the Legislature of the power of taxing the company. *Union Pass. R. Co. v. Philadelphia,* 101 U. S. 528, 25 L. Ed. 912; *Spring Valley Waterworks v. Schottler,* 110 U. S. 347, 4 Sup. Ct. 48, 28 L. Ed. 173; 2 Morawetz on Private Corporations, §§ 1061, 1062, 1066 1085, 1095, 1097.

"Under section 1090 of the Iowa Code, the Legislature had the power not only to repeal and amend the articles of incorporation of the company, but to impose any conditions upon the enjoyment of its franchise which the General Assembly might deem necessary for the public good. The reservation of this power was a condition of the grant. The city council could make no arrangement with the company which would not be subject, under that section, to the superior power of the General Assembly.    *    *    *

"Moreover, the city derived from the state alone its power to grant a license to the company. The right to operate the railway in the streets is a franchise obtained through power given to the city by the state, but the state reserved the power to regulate such franchise and impose conditions upon it. It reserved the power to determine the question of the exemption of the company from taxation, and to prescribe what burdens should be imposed upon it for the public good in the enjoyment of its franchise. Manifestly, such power of the state would exist, if the right to occupy the streets with tracks were granted to the company directly, or by an

act of the Legislature of the state; and the case is not changed by the fact that the franchise was granted by the city. There is nothing in the ordinance of the city council which takes away the power of the state and the city to impose additional taxes on the property of the company, or which indicates an intent that no further or different tax should be subsequently imposed on its property.' *Delaware R. R. Tax Case,* 85 U. S. 206, 227, 21 L. Ed. 888, 895; *Union Pass R. Co., v. Philadelphia,* 101 U. S. 528, 536, 25 L. Ed. 912, 913; *Com. v. Easton Bank,* 10 Pa. 451.

"No question can arise as to the impairment of the obligation of a contract, when the company accepted all of its corporate powers subject to the reserved power of the state to modify its charter and to impose additional burdens upon the enjoyment of its franchise. Under the act of March 15, 1884, it was made a condition of the enjoyment of its franchise by the company that, when the city should determine that the streets should be paved, the company should bear a certain portion of the cost thereof; and any prior contract between the company and the city in regard to paving was subject to the provisions of section 1090 of the Code. There was nothing in the ordinance of December 12, 1883, which bound or could bind the city not to exercise its statutory authority to impose other conditions upon the exercise of the rights of the company."

Whoever insists that any particular property is not subject to the same burdens as imposed by law on the same character of property similarly circumstanced, has the burden of proof, and must make it clear that by contract or otherwise the property is beyond its reach. Claims of exemption from taxation must be plainly and unmistakably supported by express grant. It cannot exist by implication only. A doubt is fatal to the claim. The universal rule is that, whenever a privilege granted to a corporation comes under revision in the courts, the grant is to be strictly construed against it, and in favor of the public, and nothing passes to the corporation but what is granted in clear and explicit terms. What is not unequivocally granted, is taken to be withheld. *New York ex rel. Metropolitan Street Railway Co. v. State Board of Tax Com'rs,* 199 U. S. 35, 25 Sup. Ct. 705, 50 L. Ed. 65; *St. Louis v. United Railway Co.,* 210 U. S. 266, 28 Sup. Ct. 630, 52

L. Ed. 1054; *Wilmington & Weldon R. R. Co. v. Alsbrook,* 146 U. S. 279, 13 Sup. Ct. 72, 36 L. Ed. 972; *Ford v. Delta & Pine Land Co.,* 164 U. S. 662, 17 Sup. Ct. 230, 41 L. Ed. 590; *Memphis Gaslight Co. v. Shelby County,* 109 U. S. 398, 3 Sup. Ct. 205, 27 L. Ed. 976; *Vicksburg S. & P. R. R. Co. v. Dennis,* 116 U. S. 665, 6 Sup. Ct. 625, 29 L. Ed. 770; *Chicago Theological Seminary v. Illinois,* 188 U. S. 662, 23 Sup. Ct. 386, 47 L. Ed. 641; *Erie R. Co. v. Pennsylvania,* 21 Wall. 492, 22 L. Ed. 595; *Charles River Bridge v. Warren Bridge,* 11 Pet. 420, 9 L. Ed. 773; *New Orleans & Lake City R. R. Co. v. New Orleans,* 143 U. S. 192, 12 Sup. Ct. 406, 36 L. Ed. 121; *Peoples' Passenger R. R. Co. v. Memphis R. R. Co. et al.,* 10 Wall. 38, 56, 19 L. Ed. 844; *Denver R. R. Co. v. Denver City R. R. Co.,* 2 Colo. 673; *Lasher v. People,* 183 Ill. 226, 55 N. E. 663, 47 L. R. A. 802, 75 Am. St. Rep. 103; *Metropolitan R. R. Co. v. Chicago West Div. R. R. Co.,* 87 Ill. 317; *Fair Haven & Westville R. R. Co. v. City of New Haven,* 203 U. S. 379, 27 Sup. Ct. 74, 51 L. Ed. 237; *Greenwood v. Freight Co.,* 105 U. S. 13, 26 L. Ed. 961; *Rice v. R. R. Co.,* 66 U. S. 358, 27 L. Ed. 47.

There is nothing in section 4 of the ordinance expressly exempting the street railway company from any additional paving, it being merely stipulated therein that it shall pave the space or area between the rails when the municipality required paving to be done by the abutting property owners on such street or streets, or elected to do so itself. In line with the authorities which hold to the effect that unless such exemption is clearly expressed the same will not be presumed by implication, we conclude that there is no exemption in this ordinance that precludes the legislative power of the state from imposing such additional burden upon the street railway company, especially when the same is reasonable, proper, and just, but if we had any doubt as to this conclusion, and we have not, we would resolve such in favor of the public. Taxation should be imposed by the sovereignty, so far as it can be, with justice and equality to all. Pav-

ing should be a common burden to all abutting proprie-
tors, and should be borne by common contributions under fixed
rules, apportioned as far as practicable according to justice and
equity. It is necessary that streets should be paved in the build-
ing of cities, that travel may be facilitated and sanitation pro-
moted. The street railway company is one of the greatest recip-
ients of the benefits from such improvements. The adjoining lot
proprietor is required to pay for the adjacent paving, as he is pre-
sumed to be a direct beneficiary therefrom. The paving, between
the rails and two feet outside either way covers area that is al-
most exclusively used by the street railway company, and it is
nothing but a proper regard for the rights of the other abutting
proprietors that such companies should be required to bear *pro
rata,* such burdens.

Section 47, art. 9 (Bunn's Ed. § 262) Const. Okla., pro-
vides that:

"The Legislature shall have power to alter, amend, annul, re-
voke, or repeal any charter of incorporation or franchise now
existing and subject to be altered, amended, annulled, revoked or
repealed at the time of adoption of this Constitution or any
that may be hereafter created, whenever in its opinion it may be
injurious to the citizens of this state, in such manner, however,
that no injustice shall be done to the incorporators."

The constitutional convention, desiring to preserve the reser-
vations in section 932, Wilson's Rev. & Ann. St. 1903, *supra,* in-
corporated said section in the Constitution, and specifically in-
cluded franchises.

In the case of *Noble State Bank v. C. N. Haskell et al., ante* p.
48, 97 Pac. 590, the clause, "in such manner, however, that no in-
justice shall be done to the incorporators," was construed not to
be a limitation upon the power of the Legislature to act, but re-
quiring provision to be had for the preservation of the assets after
the repeal or modification of the charter.

But concede that it was a limitation upon the power of the
Legislature, the extra two feet of paving on each side of the rail-

way tracks required of the railway companies would not be an injustice to the incorporators or stockholders, for the railway company occupies the streets, which are the property of the adjacent proprietors, subject to a public easement. The adjacent proprietor, acquiring his title by purchase, is required to pay for the paving of the abutting street. The street railway company, acquiring the right to use the street by grant of the council, without any consideration beyond the construction and maintaining of its line, and a contingent gross receipt tax, must sustain the two feet additional paving on each side of the tracks, it being an actual and incidental benefit to such company.

The reservation to the state of the controlling power, in the way of taxation as to franchises and grants from municipalities of a public nature, is wise and salutary. The municipality, being a subdivision of the state, exists by grant of delegated power, either in the organic law or by enactment of the Legislature. These municipal subdivisions in their infancy, by an overdesire to build and grow, frequently through their municipal government ill advisedly grant away valuable franchises, shackling and burdening future generations. And were it not for the wise provisions in the economy of our law, reserving the power to amend and repeal, and to impose additional burdens upon franchises and these public privileges, the officers of such municipalities, in their overdesire to build, grow, and develop might unwisely burden the future to develop the present.

No municipal body has the moral right to grant away the privileges and rights of future generations. It is an unwise and unfatherly parent that makes obligations that will bind and shackle and dwarf his children, and bring them to grief and misfortune. It is an unwise municipal government that would seek to shackle and to bind the administrations of the coming years. And it is wise and salutary in the economy of state building that such powers have been reserved to the Legislature to have the paramount supervision and control.

The framers of the Constitution, having this high purpose in view, incorporated section 5, art. 10 (Bunn's Ed. § 268), which provides that: "The power of taxation shall never be surrendered, suspended, or contracted away. Taxes shall be uniform upon the same class of subjects." At the same time desiring that cities should be built and developed, streets paved, and public improvements made, section 7, art. 10 (Bunn's Ed. § 272), was also incorporated, which provides that:

"The Legislature may authorize county and municipal corporations to levy and collect assessments for local improvements upon property benefited thereby, homesteads included, without regard to a cash valuation."

Nor does section 1 of the Schedule to the Constitution (Bunn's Ed. § 450) militate against this rule, wherein it provides that: "No existing rights, actions, suits, proceedings, contracts, or claims shall be affected by the change in the forms of government, but all shall continue as if no change in the forms of government had taken place; * * * *" for the Legislature of the territory of Oklahoma had the power to enact just such a statute as that passed by the Legislature of the state on the 17th day of April, A. D. 1908.

The court below was in error in holding that the street railway company was released or exempted by the provisions of the ordinance from assessment for the two feet of paving on each side of its tracks, unless section 3, art. 4, ch. 9, p. 141, Sess. Laws Okla. 1903, which provides that: "All licenses or franchises heretofore granted to any street railway company authorizing the construction and operation of an electric street railroad in any city of the first class in the territory of Oklahoma, and, which have not become forfeited or lapsed by their terms, are hereby ratified, legalized, and confirmed," changes the rule. As the street railway company is neither a party to this action, nor has it made any appearance hereto, we decline to pass upon the proposition, and reserve our determination thereon; this point having neither been argued nor briefed before this court in this case.

As a result of the conclusions herein reached as to finding No. 1, below, it is not necessary to consider finding No. 2.

The conclusions of the lower court as to findings Nos. 3, 4, 5, and 6 appear to be correct.

Was the seventh finding eroroneous? From section 3 of the act of April 17, 1908, it appears that the Legislature intended that lots and pieces or parcels of land fronting and abutting upon any such improvements should bear the burden of the expenses thereof to the center of the block, where the abutting way is on the exterior of the block, and to the exterior, where any improvements are made on any alley or other public way in the interior of the block. The quarter block shall be charged with improving the side streets on which said block abuts, together with the areas formed by street intersections and alley crossings, except such portion of such street intersections and alley crossings as maybe used by street or steam railways, which cost shall be apportioned among the lost and subdivisions of such quarter block, according to the benefits to be assessed to each lot or parcel; that in case of an alley extending through a block which shall not be in the center of the block, then the assessment shall be made upon the property extending from the exterior of the block to such alley, and, when triangular or other irregular shaped lots or tracts are to be assessed for any such improvement any part of the cost of such improvement in excess of the benefits accruing to such lots or tracts shall be borne by the city and paid from the street and bridge fund of the city.

We think it sufficiently appears from this act it was the intention that where improvements were made on the front of a block, where all of the lots fronted on the abutting improvement, and extended back to an exterior parallel boundary, that they should bear their proportion of the cost of such improvement, according to the frontage of the abutting property. But where it was on a side street, where the lot extended back to the interior from the front, resulting in the corner lot entirely abutting on the side

street, then the quarter block should bear all the burden of that improvement *pro rata* with the benefits accruing therefrom. In case of an alley extending not through the center of the block, but parallel with and of equal length to the exterior of the block, the assessment shall also be made upon the abutting exterior, prorated to the total cost according to the frontage. When triangular, or other irregular tracts are to be assessed, any part of the cost for such improvement in excess of the benefits accruing to such lots or tracts shall be borne by the city and paid from the street and bridge fund of said city. The provision that "the mayor and council may in their discretion provide for the payment of the cost of improving street intersections and alley crossings, which cost shall be provided for and paid by such city, and for the purpose of paying such expense a separate and special levy shall be made and entered against all the property of the city at the next annual tax levy after such estimate is made, which said expense shall embrace the *pro rata* part of the expense of advertising and making profiles and specifications, together with the expense charged by the city engineer, superintendents, and in all other respects," is valid. The fact that Const. § 7, art. 10 (Bunn's Ed. § 272), specifically authorizes county and municipal corporations "to levy and collect assessments for local improvements upon property benefited thereby, homesteads included without regard to a cash valuation," is not such an exclusive grant (Const. § 36, art. 5 [Bunn's Ed.] § 109, Cooley's Const. Lim. [7th Ed.] pp. 265, 266) as to preclude the city from levying an annual tax therefor against all the taxable property of the city.

Section 5 provides that the board of appraisers shall appraise and apportion the benefits to the several lots and tracts of land, designated by proper resolution. The benefit to the abutting property on the exterior of the block, where the alley is in the center of the block, or where not in the center but running the same parallel distance with such exterior, is fixed arbitrarily according to the *pro rata* frontage, and is not a matter of judg-

ment, but of calculation, with said board, though it is otherwise as to the assessment of side street frontage and triangular and irregular shaped tracts.

The next question is as to the power of the Legislature to declare what is and what is not an emergency. Section 58, art. 5, (Bunn's Ed. § 131) Const. Okla., provides:

"No act shall take effect until ninety days after the adjournment of the session at which it was passed, except enactments for carrying into effect provisions relating to the initiative and referendum, or a general appropriation bill, unless, in case of emergency, to be expressed in the act. * * * An emergency measure shall include only such measures as are immediately necessary for the preservation of the public peace, health or safety, and shall not include the granting of franchises or license to a corporation or individual, to extend longer than one year, nor provision for the purchase or sale of real estate, nor the renting or encumbrance of real property for a longer term than one year. * * * "

Under this section it is provided that an emergency shall include only such measures as are immediately necessary for the public peace, health or safety, to be declared by the Legislature, such emergency to be expressed in the act. The question now arises as to whether or not the judgment of the Legislature in declaring such emergency is subject to be revised by the courts. In the case of *De Camp v. Eveland,* 19 Barb. (N. Y.) 89, the court said:

"The legislative power is the very highest attribute of sovereignty, and its depositary the embodiment and concentration of the whole political force of the body politic, with such restraint only as the charter of the government has imposed. It is the lawmaking power, and, as heretofore remarked, superior to either of the other departments of government."

Section 1, art. 4 (Bunn's Ed. § 50) Const. Okla., provides as follows:

"The powers of the government of the state of Oklahoma shall be divided into three separate departments: The legislative, executive, and judicial; and except as provided in this Constitution, the legislative, executive, and judicial departments of gov-

ernment shall be separate and distinct and neither shall exercise the powers properly belonging to either of the others."

The provisions of the initiative and referendum in our Constitution are, in many respects, the same as those in Oregon.

In the case of *Kadderly v. City of Portland,* 44 Or. 118, 74 Pac. 720, Mr. Justice Bean, in delivering the opinion of the court, said:

"This brings us to the question as to whether the legislative declaration that the Portland charter was necessary for the preservation of the public peace, health, and safety is conclusive on the courts. Under the initiative and referendum amendment, laws 'necessary for the immediate preservation of the public peace, health, and safety' are excepted from its operation. As to them, the action of the legislative and executive departments is conclusive and final, so far as their enactment is concerned. No power is reserved to the people to approve or disapprove them. They are not subject to the referendum amendment, and as to them the powers of the other departments of the government derived from the Constitution are unaffected. The Legislative Assembly may, in its discretion, put them into operation through an emergency clause, as provided in section 28, art. 4, of the Constitution, or it may allow them to become laws without an emergency clause; the necessity or expediency of either course being a matter for its exclusive determination. As to all other laws the amendment applies, and they cannot be made to go into operation for 90 days after the adjournment of the session at which they were adopted, or until after approval by the people if the referendum is invoked. Section 28, art. 4. of the Constitution, giving the Legislative Assembly power to put any law into force upon approval by declaring an emergency, has been modified by the amendment of 1902, so as to exclude from the power to declare an emergency all laws except those necessary for the immediate preservation of the public peace, health, or safety. So far all are agreed. But the vital question is, what tribunal is to determine whether a law does or does not fall under this classification? Are the judgment and findings of the Legislative Assembly conclusive, or are they subject to review by the courts?

"The inquiry is much simplified by bearing in mind that the exception in the constitutional amendment is not confined to such laws as the Legislative Assembly may legally enact by virtue of the

police powers of the state, or to those alone that may affect the public peace, health, or safety. The police power is limited to the imposition of restraints and burdens on persons and property, in order to secure the general comfort, health, and prosperity of the state. Tiedeman, Lim. Pol. Power, § 1. But the language of the constitutional amendment is broader, and includes all laws of whatsoever kind, necessary for the immediate preservation of the public peace, health, or safety, whether they impose restraints on persons or property, or come strictly within the police powers, or not. The laws excepted from the operation of the amendment do not depend alone upon their character, but upon the necessity for their enactment in order to accomplish certain purposes. As to such laws, the amendment of 1902 does not in any way abridge or restrict the power of the Legislature, which, by the insertion of a proper emergency clause, may unquestionably cause them to go into effect upon approval by the Governor. As the Legislature may exercise this power when a measure is in fact necessary for the purposes stated, and as the amendment does not declare what shall be deemed laws of the character indicated, who is to decide whether a specific act may or may not be necessary for the purpose? Most unquestionably, those who make the laws are required, in the process of their enactment, to pass upon all questions of expediency and necessity connected therewith, and must therefore determine whether a given law is necessary for the preservation of the public peace, health, and safety. It has always been the rule, and is now everywhere understood, that the judgment of the legislative and executive departments as to wisdom, expediency, or necessity of any given law is conclusive on the courts, and can not be reviewed or called in question by them. It is the duty of the courts, after a law has been enacted, to determine in a proper proceeding whether it conflicts with the fundamental law, and to construe and interpret it so as to ascertain the rights of the parties litigant. The powers of the courts do not extend to the mere question of expediency or necessity, but, as said by Mr. Justice Brewer, 'they are wrought out and fought out in the Legislature and before the people. Here the single question is one of power. We make no laws. We change no Constitutions. We inaugurate no policy. When the Legislature enacts a law, the only question which we can decide is whether the limitations of the Constitution have been infringed upon.' *Prohibitory Am. Cas.* 24 Kas. 700, 706. The amendment excepts such law as may be

necessary for certain purposes. The existence of such necessity is therefore a question of fact, and the authority to determine such fact must rest somewhere. The Constitution does not confer it upon any tribunal. It must, therefore, necessarily reside with that department of the government which is called upon to exercise the power. It is a question of which the Legislature alone must be the judge, and when it decides the fact to exist, its action is final. *Biggs v. McBride,* 17 Or. 640, 21 Pac. 878, 5 L. R. A. 115; *Umatilla Irrigation Co. v. Barnhart,* 22 Or. 389, 30 Pac. 37; *Gentile v. State,* 29 Ind. 409; *Wheeler v. Chubbuck,* 16 Ill. .361; Sutherland, St. Const. 108.

"In this view we are supported by the Supreme Court of South Dakota. In 1898 an amendment to the Constitution of that state was adopted by the people, similar in many respects to the amendment now under consideration; and, so far as the laws exempted from its operation are concerned, the language of the two amendments is identical. In *State ex rel. v. Bacon,* 14 S. D. 394, 404, 85 N. W. 605, 608, the court say in referring to this amendment: 'It will be observed that the law of 1901 which we are considering not only declares that an emergency exists, but also that the provision is necessary for the immediate preservation and support of the existing public institutions of this state. It seems to have been uniformly held under Constitutions containing an emergency clause, and providing that laws containing such a clause shall take effect as therein directed, that the action of the Legislature in inserting such a clause is conclusive upon the courts. (Citing authorities.) No reason occurs to us why the same rule should not apply to the act in question. The Legislature having declared that the provisions of that act are necessary for the immediate preservation and support of the existing public institutions of the state, that declaration is conclusive upon this court. and brings this class clearly within the exception contained in section 1 (as amended) of article 3 of the Constitution.'

"But, is is argued, what remedy will the people have if the Legislature, either intentionally or through mistake, declare falsely or erroneously that a given law is necessary for the purposes stated? The obvious answer is that the power has been vested in that body, and its decision can no more be questioned or reviewed than the decision of the highest court in a case over which it has jurisdiction. Nor should it be supposed that the Legislature will disregard its duty, or fail to observe the mandates of the Constitution. The

courts have no more right to mistrust the Legislature than it has to mistrust the courts. The Constitution has wisely divided the government into three separate and distinct departments, and has provided that no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in the Constitution expressly provided. Const. art. 3, § 1. It is true that power of any kind may be abused when in unworthy hands. That, however, would not be a sufficient reason for one co-ordinate branch of the government to assign for attempting to limit the power and authority of another department. If either of the departments, in the exercise of the powers vested in it, should exercise them erroneously or wrongfully the remedy is with the people, and must be found, as said Mr. Justice Strahan in *Biggs v. McBride, supra,* in the ballot box."

In the case of *State ex rel. Lavin et al. v. Bacon et al.,* 14 S. D. 404, 85 N. W. 608, Mr. Justice Corson, in delivering the opinion of the court said:

"In the view we take of these constitutional provisions, there are three classes of laws under this amendment, namely: Laws that do not take effect until the expiration of 90 days after the adjournment of the Legislature, and are not clearly within one of the exceptions; laws coming within the exceptions specified in section 1, which may or may not take effect within 90 days, depending upon whether or not they are passed by the emergency clause; and laws passed under the provisions of section 22, art. 3, which contain an emergency clause. It is only to the first class that the provisions of section 1 are applicable. Where, therefore, laws are passed without an emergency clause, and do not come within the class excepted from the provisions of that section, they must be suspended until the people can vote upon the same upon the filing of a petition as provided in chapter 93, p. 121, Laws 1899. But no such petition can suspend the operation of the laws in the other two classes of laws.

"It will be observed that the law of 1901 which· we are considering not only declares that an emergency exists, but also that the 'provision is necessary for the immediate preservation and support of the existing. public institutions of this state.' It seems to have been uniformly held under Constitutions containing an emergency clause, and providing that laws containing such a clause shall take effect as therein directed, that the action· of the

Legislature in inserting such a clause is conclusive upon the courts. *Mark v. State,* 15 Ind. 98; *Day Land & Cattle Co. v. State,* 68 Tex. 526, 4. S. W. 865; *Hendrickson v. Hendrickson.* 7 Ind. 13; *Carpenter v. Montgomery,* 7 Blackf. (Ind.) 415. No reason occurs to us why the same rule should not apply to the act in question. The legislature having declared that the provisions of the act are necessary for the immediate preservation and support of the existing public institutions of the state, that declaration is conclusive upon this court, and brings this class clearly within the exception contained in section 1, (as amended) of article 3 of the Constitution."

To determine under a state Constitution what can be accomplished by general or special legislation, has been, with but few exceptions, held to be a question solely for the Legislature. *Martin v. Mott,* 12 Wheat. 28, 6 L. Ed. 537; *Clarke et al. v. Jack et al.* 60 Ala. 278; *In re Greer,* 58 Kan. 270, 48 Pac. 950; *Evansville v. State,* 118 Ind. 426, 21 N. E. 267, 4 L. R. A. 93; *Wiley v. Bluffton,* 111 Ind. 152, 12 N. E. 165; *Brown v. Denver,* 7 Colo. 305, 3 Pac. 455; *People v. McFadden,* 81 Cal. 489, 22 Pac. 851, 15 Am. St. Rep. 66; *Richmond v. Supervisors, Muscatine County,* 77 Iowa, 513, 42 N. W. 422, 4 L. R. A. 445, 14 Am. St. Rep. 308; *Owners of Land v. People,* 113 Ill. 296; *State v. Boone County,* 50 Mo. 317, 11 Am. Rep. 415; *McGill v. State,* 34 Ohio St. 228; *State v. Hitchcock,* 1 Kan. 178, 81 Am. Dec. 503; *Carson v. St. Francis Levee District,* 59 Ark. 513, 27 S. W. 590; *Stockton v. Powell,* 29 Fla. 1, 10 South. 688, 15 L. R. A. 42; *Whited v. Lewis,* 25 La. Ann. 568; *People v. Bowen,* 21 N. Y. 517; *Edmonds et al. v. Herbrandson et al.* 2 N. D. 270, 50 N. W. 970, 14 L. R. A. 725; *Wheeler v. Chubbuck,* 16 Ill. 362.

We conclude that the judgment of the Legislature in determining whether or not an emergency existed—that is, whether or not a measure is immediately necessary for the preservation of the public peace, health, or safety—rests solely with the Legislature. It is not subject to review by the courts, or any other authority except the people. Under the reserved power of the initiative

and referendum, after the declaration of an emergency when not referred to the people for their judgment in such measure it still remains with the people, if they are dissatisfied with a measure, by an initiative petition to cause the same to be submitted to the people at the next general election for determination as to whether or not such act shall be repealed.

But it is further provided that emergency measures shall not include the granting of franchises or license to a corporation or individual to extend longer than one year, nor provision for the purchase or sale of real estate, nor the renting or incumbrance of real property for a longer term than one year. These are specific limitations or prohibitions upon the power of the Legislature, and it remains to determine whether or not the act of April 17, 1908, comes within such limitation or prohibition. Section 5 provides:

"Assessments in conformity to said appraisement and apportionment, as corrected and confirmed by the council, shall be payable in ten equal annual installments. * * * Such special assessments, and each installment thereof, and the interest thereon, are hereby declared to be a lien against the lots and tracts of land. * * *"

The question arises as to whether or not the paving act, providing for a lien against the abutting property, to be discharged by 10 annual payments, comes within the prohibition "not to include the granting of a franchise or license to a corporation or individual to extend longer than one year, nor provision for the purchase or sale of real estate, nor the renting or incumbrance of real property for a longer term than one year."

It is insisted by plaintiff in error that the meaning of said provision is the purchase of land for or sale of land belonging to, the state, and that the clause relating to the incumbrance of real property for a longer term than one year is a limitation thereon. If this be true, the effect would be only to prohibit a direct act of the Legislature disposing of or incumbering lands of the state becoming effective at once by means of the emergency, whilst an

act authorizing some designated officer, under certain rules and regulations, to sell, lease, or incumber real estate for a longer term than one year belonging to the state, would be subject to the emergency. There is no intendment in construction that the framers of the Constitution intended to permit something to be done indirectly which could not be done directly, having the same logical and practical effect.

It is further insisted that the emergency clause of said paving act was not in violation of the Constitution, for the reason, among others, that the act itself does not include the renting or incumbering of real property for a longer term than one year, but only affords a way by which a municipality may provide for street improvement and assess the benefits to the property abutting thereon, such assessment, after the assessment ordinance is passed, becoming a lien upon the abutting property. This contention is likewise met with the same objection as the one above.

An act prescribing the form of instrument, and providing for the recording of the same, by which any party may mortgage or incumber his property by his own voluntary act, would not come within the prohibition as to the emergency; but an act, the terms of which, followed out to its logical conclusion, will fasten a lien or incumbrance upon one's property by operation of law for a longer term than one year, comes within such prohibition as to the emergency.

It is further insisted that the lien levied under the paving act, which is by the terms of the act to be discharged by 10 annual payments upon the property, is not an incumbrance; and section 7, art. 10, of the Constitution (Bunn's Ed. § 272), which provides that "the Legislature may authorize county and municipal corporations to levy and collect assessments for local improvements upon property benefited thereby, homesteads included, without regard to a cash valuation," is cited in support of that contention. The fact that the assessment is made upon the property benefited does not indicate that the assessment, when properly made, does not be-

come a debt, not only against the owner, but also against the property, for in order that there may be a lien there must be a debt, a debt being prerequisite to the lien. *Jones v. Chaffin,* 102 Ala. 385, 15 South. 143.

Now here we have improvements authorized and provision made for the payment therefor by assessment upon the abutting property benefited thereby, and the Legislature is authorized by said provision to make it effective, and in so doing it is declared that such assessment shall become a lien upon such property with the purpose of facilitating such improvement. For, if the assessment becomes a lien upon the property, the payment of same is more secure, and parties can be more readily induced to make such improvements.

Under the same power, specially conferred by section 7, art. 10, *supra,* for the purpose of preventing the making of improvements and the levying of the assessments from becoming a burden upon the abutting property owners, it is further provided that such assessments may be paid in 10 annual installments, and said act contemplates that such lien may not be entirely discharged until the expiration of 10 years.

It is further suggested that by the construction here reached as to the Legislature being prohibited from declaring an emergency to an act authorizing a municipality to levy a special assessment for paving benefits, where the assessments are to be paid in 10 annual installments, the Legislature is likewise prohibited from declaring an emergency to a tax or revenue bill, or any act levying or authorizing the assessment or levy of any tax upon real estate, as the lien created by such levy may continue for a period of longer than one year if it is not paid or discharged when it becomes due. But a revenue or tax bill provides only for an annual tax, to be levied annually and to cover only one year. It is also to be paid or discharged as it matures, and when default is made such lien is to be foreclosed and such tax collected. Under a revenue bill, the tax lien does not create an incumbrance for a

longer term than one year, and if default is made the said tax is
to be realized and the lien foreclosed in accordance with law.   If
the contention as suggested were true, it would have the effect of
prohibiting an emergency to any act wherein any incumbrance or
lien was provided for, for if the incumbrance or lien was provided
for a term of one year or less, and was not discharged as the debt
or tax became due, then the fact that the lien remained in force
subject to be realized on, under the suggested contention it would
create the possibility that any lien, though created by law for only
one year or less, may extend longer on account of default.   This
line of reasoning would render absolutely ineffective the provision
of the Constitution, and result in the emergency being prohibited
to all acts in any way providing for an incumbrance or lien on
real estate.   It follows that said section does not prevent the ap-
plication of the emergency to a revenue bill.

Under the paving act it is contemplated that the assessment
should not be entirely discharged until 10 years have elapsed, and
that during that time there shall be a continuing lien or incum-
brance for the 10 several annual installments, except as the same
may be discharged or paid off, upon the property affected.

We conclude that the act here in controversy, heretofore re-
ferred to as the "Paving Act," contemplates the incumbrance of
real property for a longer term than 1 year, and did not become
effective until 90 days after the adjournment of the Legislature,
and it is ordered that the lower court enter judgment on said find-
ings in accordance with this opinion.   Reversed.

All the Justices concur.